**Case No. 25-273**

---

**THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

STATE OF ARIZONA,

*Plaintiff-Appellant,*

*v.*

UNITED STATES INTERNAL REVENUE SERVICE, *et al.,*

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the District of Arizona

No. 2:24-cv-00355-GMS

---

**OPENING BRIEF OF THE STATE OF ARIZONA**

---

Joshua D. Bendor (AZ Bar No. 031908)
Alexander W. Samuels (AZ Bar No. 028926)
Clinten N. Garrett (AZ Bar No. 022457)
Kathryn E. Boughton (AZ Bar No. 036105)
OFFICE OF THE ARIZONA
  ATTORNEY GENERAL
2005 N. Central Ave., Phoenix, AZ 85004
(602) 542-3333
Joshua.Bendor@azag.gov
Alexander.Samuels@azag.gov
Clinten.Garrett@azag.gov
Kathryn.Boughton@azag.gov
ACL@azag.gov

*Counsel for State of Arizona*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ i

INTRODUCTION ........................................................................... 1

STATEMENT OF JURISDICTION ................................................... 4

STATEMENT OF ISSUES .............................................................. 5

STATEMENT OF THE CASE .......................................................... 5

I.    The IRS made inconsistent tax determinations. ..................... 5

    A.    The IRS determined that 21 state tax rebates and payments were nontaxable. ............................................. 5

        1.    Tax refunds are excludable from federal taxation under the general welfare and disaster relief exclusions. ................................................ 6

        2.    A tax refund is not "income" and is therefore generally nontaxable ................................... 8

    B.    Arizona enacted a one-time tax rebate shortly thereafter. ................................................................. 9

    C.    The IRS affirmed its February 2023 guidance. .............. 10

    D.    The IRS unlawfully declared that the Tax Rebate is taxable in full, harming Arizona and its taxpayers.... 12

    E.    The IRS provided conflicting rationales for its discriminatory treatment of Arizona ........................... 13

        1.    The IRS changed its story about the basis for its exclusion determinations. ................................. 14

i

2.      The IRS confirmed its misapprehension about when rebates are taxable income absent an exclusion. .................................................... 14

II.   The district court declined to enter a preliminary injunction on one basis and then dismissed the action on a different basis. ................................................................................ 15

A.      Arizona sued to enjoin the IRS's unlawful determination. ................................................................. 15

B.      The district court declined to enter a preliminary injunction, while acknowledging the merit of Arizona's claims. ................................................................. 15

C.      The district court erroneously dismissed the action on standing grounds and Arizona timely appealed. ........................ 16

STANDARD OF REVIEW ................................................ 17

SUMMARY OF ARGUMENT ............................................. 17

ARGUMENT ................................................................. 22

I.    Arizona has standing to bring its claims. ............................ 22

A.      The IRS's interference with Arizona's sovereign taxing prerogative establishes standing. ..................... 22

B.      The IRS's discriminatory treatment of Arizona establishes standing. ....................................... 25

1.      There is no evidence—let alone uncontroverted evidence—that the IRS made consistent reasoned decisions. ............................................... 27

2.      There is nothing special about a particular calendar year. ........................................ 29

3.      The IRS does not have discretion to illegally tax nonincome. .......................................... 32

C. Arizona's specific tax-loss injury establishes standing..............33

II. No alternative justiciability or pleadings argument supports dismissal.................................................................................40

    A. The IRS's alternative justiciability arguments fail......................40

        1. The Anti-Injunction Act does not bar Arizona's suit. ..................................................................................40

            (a) The *Regan* exception allows suits by states to vindicate their sovereign interests.......................41

            (b) *Yakama Nation* is distinguishable and must be read with *Regan*.......................................43

            (c) The *Enochs v. Williams Packing* exception also applies...................................................46

            (d) An exception under the AIA also applies to the Declaratory Judgment Act ("DJA")...................47

        2. Any sovereign immunity arguments are unavailing.................................................................47

    B. Arizona has stated meritorious claims that cannot be dismissed at the pleadings stage....................................50

        1. A rebate of state taxes paid is not a taxable accession to wealth....................................................51

        2. The IRS must make reasoned exclusion determinations........................................................53

            (a) General welfare exclusion. ..........................53

            (b) Disaster relief exclusion..............................56

CONCLUSION ....................................................................59

CERTIFICATE OF COMPLIANCE ....................................................60

iii

CERTIFICATE OF SERVICE ..............................................................61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. Yellen*,
  34 F.4th 841 (9th Cir. 2022)................................................................... passim

*Azima v. RAK Inv. Auth.*,
  926 F.3d 870 (D.C. Cir. 2019)............................................................................57

*Bennett v. Spear*,
  520 U.S. 154 (1997).........................................................................................49

*Burns v. McGill*,
  No. 3:98-1150, 1999 WL 1090818 (M.D. Tenn. Oct. 13, 1999) .....................47

*City of Oakland v. Lynch*,
  798 F.3d 1159 (9th Cir. 2015) .........................................................................33

*Com. of Pa., by Shapp v. Kleppe*,
  533 F.2d 668 (D.C. Cir. 1976).........................................................................38

*Comm'r v. Glenshaw Glass Co.*,
  348 U.S. 426 (1955).........................................................................................50

*Confederated Tribes & Bands of Yakama Indian Nation v. Alcohol & Tobacco Tax
  & Trade Bureau*,
  843 F.3d 810 (9th Cir. 2016) ................................................................ 16, 44, 46

*Enochs v. Williams Packing & Nav. Co.*,
  370 U.S. 1 (1962).............................................................................................46

*Est. of McLendon v. Comm'r*,
  135 F.3d 1017 (5th Cir. 1998) .........................................................................56

*F.C.C. v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009).........................................................................................56

*Ginsburg v. United States*,
    922 F.3d 1320 (Fed. Cir. 2019) .......................................................53

*Idaho Rivers United v. U.S. Forest Serv.*,
    857 F. Supp. 2d 1020 (D. Idaho 2012) ...........................................50

*In re Texas Ass'n of Pub. Schools Prop. & Liability Fund*,
    598 B.R. 570 (W.D. Tex. 2019) ......................................................49

*Ipsen Biopharmaceuticals, Inc. v. Azar*,
    943 F.3d 953 (D.C. Cir. 2019)........................................................50

*Kansas v. Biden*,
    736 F. Supp. 3d 1020 (D. Kan. 2024) .............................................38

*Kentucky v. Biden*,
    23 F.4th 585 (6th Cir. 2022)...........................................................24

*King Mountain Tobacco Co., Inc. v. Alcohol & Tobacco Tax & Trade Bureau*,
    No. CV-11-3038-RMP, 2012 WL 12951864 (E.D. Wash. Sept. 24, 2012).....48

*Lies v. Farrell Lines, Inc.*,
    641 F.2d 765 (9th Cir. 1981) ..........................................................34

*Maines v. Comm'r*,
    144 T.C. 123 (2015)...................................................... 12, 21, 33, 52

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)............................................................ 17, 22, 41

*Navajo Nation v. Dep't of the Interior*,
    876 F.3d 1144 (9th Cir. 2017) ........................................................47

*New York v. Mnuchin*,
    408 F. Supp. 3d 399 (S.D.N.Y. 2019)....................................... 37, 45

*New York v. Yellen*,
    15 F.4th 569 (2d. Cir. 2021) ....................................................passim

*Nw. Austin Mun. Util. Dist. No. One v. Holder*,
    557 U.S. 193 (2009).......................................................................26

*Ohio v. EPA*,
 98 F.4th 288 (D.C. Cir. 2024) ................................................................26

*Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*,
 465 F.3d 977 (9th Cir. 2006) ................................................................49

*Pride v. Correa*,
 719 F.3d 1130 (9th Cir. 2013) ..............................................................22

*Rivera v. Comm'r*,
 111 T.C.M. (CCH) 1156 (T.C. 2016) ....................................................53

*S. Utah Wilderness All. v. Off. of Surface Mining Reclamation*,
 620 F.3d 1227 (10th Cir. 2010) ............................................................50

*Seattle Pac. Univ. v. Ferguson*,
 104 F.4th 50 (9th Cir. 2024) ....................................................... 17, 27

*Shelby Cnty. v. Holder*,
 570 U.S. 529 (2013) .................................................................... 26, 56

*South Carolina v. Baker*,
 485 U.S. 505 (1988) ..............................................................................46

*South Carolina v. Regan*,
 465 U.S. 367 (1984) ...................................................................... passim

*State of Fla. v. Mellon*,
 273 U.S. 12 (1927) ................................................................................38

*United States v. Students Challenging Regul. Agency Procs. (SCRAP)*,
 412 U.S. 669 (1973) ..............................................................................37

*Thomas v. Cnty. of Humboldt, California*,
 124 F.4th 1179 (9th Cir. 2024) ............................................................39

*Whistleblower 972-17W v. Comm'r*,
 No. 972-17W, 2022 WL 2718766 (T.C. July 13, 2022) ......................57

*Williams v. Bernhardt*,
 No. CV-20-02277-PHX-MTL, 2021 WL 2555435 (D. Ariz. June 22, 2021) .47

*Wyoming v. Oklahoma,*
  502 U.S. 437 (1992) ....................................................................passim

*XY Planning Network, LLC v. United States Securities and Exchange Commission,*
  963 F.3d 244 (2d. Cir. 2020) ..................................................... 38, 39

*Yamaha Motor Corp., U.S.A. v. United States,*
  779 F. Supp. 610 (D.D.C. 1991) .......................................................47

## Statutes and Constitutional Provisions

5 U.S.C. § 702 ...................................................................................47

16 U.S.C. § 6050E .............................................................................24

26 U.S.C. § 1 ............................................................................... 32, 50

26 U.S.C. § 61 ............................................................................. 32, 50

26 U.S.C. § 139(b)(4) ........................................................................56

26 U.S.C. § 7421(a) ...........................................................................40

28 U.S.C. § 1291 .................................................................................4

28 U.S.C. § 1340 .................................................................................4

U.S. Const. amend. XVI .............................................................. 32, 50

U.S. Const. art. I ................................................................................50

## Rules

Fed. R. App. P. 4(a)(1)(B) ....................................................................5

## Other Authorities

IRS, Suits Against the United States, at § 5.17.5.4(2),
  https://www.irs.gov/irm/part5/irm_05-017-005. ....................................47

iv

## INTRODUCTION

This appeal asks the Court to decide whether a state has legal recourse when the Internal Revenue Service imposes a facially unlawful and discriminatory tax on state tax refunds to the state's taxpayers. The district court's answer—that Arizona lacks standing to pursue claims that the court acknowledged to be meritorious—is contrary to controlling authority finding state standing based on sovereign and economic injuries materially identical to those that Arizona has alleged, and it should be reversed.

In early 2023, the IRS analyzed tax refunds and payments issued by 21 states and concluded that all 21 were federally nontaxable for one of two reasons. First, the IRS said that 17 of the 21 state payments qualified for either the general welfare or disaster relief exclusions from income, in part (but not exclusively) due to their direct or indirect connection to the COVID-19 emergency. And second, as to the remaining four states, the IRS recited the fundamental principle that a refund of state taxes paid is not, in any event, a taxable accession to wealth, provided that a taxpayer has not federally deducted his or her state taxes.

A few months after the IRS made these determinations—and while the COVID-19 emergency was still in effect—Arizona enacted a family tax

1

rebate that was materially indistinguishable from the payments that the IRS had just approved as tax free. But the IRS's treatment of Arizona and its taxpayers diverged dramatically.

According to the IRS, Arizona taxpayers were not entitled to the general welfare or disaster relief income exclusions, for reasons that remain a moving target. And because Arizona's tax rebate was not facially *limited* to taxes actually paid, the IRS declared that the *entire* rebate was *fully* taxable for *every* Arizona taxpayer, irrespective of whether a rebate exceeded taxes actually paid. That is, an Arizona taxpayer who had paid $500 in State taxes and then received a $500 tax rebate was federally taxed on $500 of "income." And likewise, a taxpayer who had paid $499 in State taxes and then received a $500 rebate was taxed—not on $1 of income—but again on $500 of "income."

The district court observed that the IRS's explanations for its inconsistent application of income exclusions were "troublesome." ER-269:9–20. And the court explicitly recognized that the IRS's taxation of the rebates in their entirety, without regard to taxes actually paid, appeared wrongful. Thus, the court said that "maybe on the merits [the State] prevail[s]" on that claim. ER-248:7–13.

2

But the State never had the opportunity to prevail on the merits, because the district court dismissed the case on standing grounds first. Inverting Rule 12 standards, the court credited the IRS's (occasional) contention that it had "applied the same 'complex fact intensive inquiry'" to all states, ER-011, while disregarding Arizona's allegations (and the record) to the contrary. The court therefore held that Arizona had failed to allege cognizable sovereign injury and dismissed the action.

Contrary to this holding, Arizona has alleged three forms of injury that separately—and beyond question, collectively—establish the State's standing.

*First*, by wrongfully taxing a State payment, the IRS harmed Arizona's sovereign taxing prerogative and left the State uncertain about when it can return money to taxpayers without the federal government taking a cut of a tax refund.

*Second*, the IRS did so on a discriminatory basis; 21 states were able to return money to their taxpayers without unlawful taxation, while Arizona was not. Rather than accept Arizona's well-pled allegations, the district court made improper (and inaccurate) factual findings that assumed away the discrimination.

3

And *third*, the IRS's unlawful taxation has caused Arizona to suffer a specific, quantified loss of State sales tax that the State otherwise would have collected if that money had remained in Arizona. No other state has alleged tax loss with Arizona's specificity and nonetheless been denied standing—and the Second Circuit recently held that New York and other states had standing on closely analogous facts. Yet the district court ignored controlling authority in favor of reliance on cases where the plaintiff had alleged only generalized tax loss.

Because the district court's dismissal on standing grounds was erroneous—and because there is no alternative basis on which the decision can stand—this Court should reverse.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because Arizona's claims arise under federal law and the U.S. Constitution. *See also* 28 U.S.C. § 1340 (jurisdiction over "any civil action arising under any Act of Congress providing for internal revenue"). This Court has jurisdiction under 28 U.S.C. § 1291, which gives the circuit courts of appeals "jurisdiction of appeals from all final decisions of the district courts of the United States."

4

The district court entered its dismissal order and judgment of dismissal disposing of all claims on November 15, 2024, and Arizona timely filed its notice of appeal on January 10, 2025. ER-004–012, ER-293–94; *see* Fed. R. App. P. 4(a)(1)(B) (allowing 60 days for notice of appeal where parties include the United States, a U.S. agency, or a U.S. officer).

## STATEMENT OF ISSUES

1. States have standing to sue in federal courts based on injury to their sovereign interests, and also based on the loss of specific tax revenue. Arizona alleged—and pled facts supporting—both sovereign injury and specific sales-tax loss arising from the IRS's taxation of Arizona's tax rebate ("Tax Rebate"). Did the district court commit reversible error by holding that Arizona lacks standing to challenge the IRS's action?

2. Are the alternative justiciability and pleadings arguments that the IRS made below unavailing?

## STATEMENT OF THE CASE

### I. The IRS made inconsistent tax determinations.

#### A. The IRS determined that 21 state tax rebates and payments were nontaxable.

In 2022, 21 states gave tax refunds or other "special payments" to their taxpayers, prompting the IRS to provide "guidance on state tax payments to

5

help taxpayers." ER-276 ¶ 18; ER-100 (IR-2023-23). The IRS determined that all 21 payment programs it analyzed were nontaxable (1) based on the general welfare or disaster relief exclusions; or (2) because returns of taxes paid are generally nontaxable if taxpayers took the standard deduction or otherwise did not deduct state taxes on their federal returns. ER-277 ¶¶ 19-20, 24-25; ER-100.[1]

### 1. Tax refunds are excludable from federal taxation under the general welfare and disaster relief exclusions.

The IRS determined that taxpayers in 17 states did not need to report the state refunds and payments as income. ER-277 ¶ 19; ER-100. Without detailing the precise bases for these determinations, the IRS explained that "[i]f a payment is made for the promotion of the general welfare or as a disaster relief payment, for example related to the outgoing pandemic, it may be excludable from income for federal tax purposes under the General Welfare Doctrine or as a Qualified Disaster Relief Payment." ER-277 ¶ 20; ER-101. The IRS also recognized that the "pandemic" was not solely a

---

[1] ER-095–191 contains the IRS determinations, the text of Arizona's Tax Rebate law, and other items underlying the allegations in the complaint. For the Court's reference, this section generally cites both the complaint (ER-273–92) and the related materials.

6

medical phenomenon, explaining that states had made payments "related to the pandemic *and its associated consequences*." ER-100 (emphasis added). And the IRS represented that "[d]etermining whether payments qualify for these exceptions is a complex fact intensive inquiry that depends on a number of considerations." ER-277 ¶ 21; ER-101.

The programs in at least Colorado, Idaho, Delaware, Alaska,[2] and Indiana did not contain *any* income qualification whatsoever. ER-281 ¶ 53; ER-104–36. Colorado, for example, called its program "Colorado Cash Back" and issued payments to all residents over age eighteen who had filed a state income tax return in 2021. ER-281–82 ¶ 54; ER-104–12. Colorado also made explicitly clear that it was issuing payments pursuant to its Taxpayer Bill of Rights, which "limits the amount of revenue the state may retain and spend in each state fiscal year." ER-281–82 ¶ 54; ER-107. Likewise, Idaho made its rebates available to "[a]ny Idahoan who was a full-year resident in 2020 and 2021 and who also filed an Idaho individual income tax return … for those years." ER-282 ¶ 55; ER-118. California called its program a "Middle Class

---

[2] The IRS deemed the "supplemental Energy Relief Payment" portion of Alaska's annual Permanent Fund Dividend nontaxable. *See* ER-102.

Tax Refund" and made refunds generally available to all residents with incomes up to $500,000. ER-282 ¶ 56; ER-138–42. And Delaware explained that its rebate "was intended to promote the general welfare of Delawareans emerging from the COVID-19 pandemic and facing higher prices at the grocery store and gas pump." ER-122.

The IRS determined that payments by each of these states were fully excludable from federal taxation.

### 2. A tax refund is not "income" and is therefore generally nontaxable.

The IRS also stated that irrespective of any applicable exclusion, a tax refund is nontaxable if it is a refund of state taxes paid and the recipient either claimed the standard deduction or claimed itemized deductions but did not deduct state taxes on his or her federal return. ER-277 ¶ 24; ER-101. And on this basis, the IRS determined that payments by four additional states (Georgia, Massachusetts, South Carolina, and Virginia) were generally nontaxable. ER-277 ¶ 25; ER-101.

The IRS therefore determined that the rebates and payments in all 21 states it analyzed were nontaxable in whole or in substantial part. ER-278 ¶ 26; ER-100.

8

### B. Arizona enacted a one-time tax rebate shortly thereafter.

A few months later, Arizona enacted the Arizona Tax Rebate. ER-278 ¶ 28; ER-144–51 (S.B. 1734, 56th Leg., 1st Reg. Sess.).

The Tax Rebate was "a onetime income tax general welfare rebate" available to taxpayers who had paid at least $1 in Arizona taxes in 2019, 2020, or 2021, and claimed at least one dependent in 2021. ER-278 ¶ 29; ER-146–47. Under the Rebate, taxpayers were eligible to receive $250 for each dependent under age seventeen and $100 for dependents age seventeen or older, capped at $750 per taxpayer. ER-278 ¶ 30; ER-147. As an additional qualification, recipients also needed to have claimed a Dependent Tax Credit (a de facto income cap). ER-279 ¶ 34; ER-146–47.

Governor Hobbs signed the Tax Rebate into law on May 11, 2023, the last day of the COVID-19 emergency declaration. ER-278 ¶ 32; ER-153. At that time, the economic disruptions that COVID-19 caused or exacerbated — the pandemic's "associated consequences," ER-100 — were front and center. Arizona's Legislature specifically found that "[i]nflation is at a forty-year high, putting gas, groceries and other necessities out of reach for many Arizonans." ER-278 ¶ 33; ER-149. The State therefore enacted the Tax Rebate

9

"to mitigate the harmful impacts of inflation by returning a portion of the surplus to this state's taxpayers with dependents." ER-278 ¶ 33; ER-149.

Approximately 75% of Arizonans who received a Tax Rebate payment had a tax liability in excess of the Rebate amount. ER-284 ¶ 72; ER-193 ¶ 4. Indeed, Arizonans who claimed a Rebate payment had an average tax liability of about $1,700, against an average Rebate amount of $370. ER-284 ¶ 72; ER-193 ¶ 4. And the vast majority of taxpayers take the standard federal deduction or otherwise do not deduct their state taxes from federal income. ER-284 ¶ 72; ER-157.

Thus, irrespective of any exclusion, there did not appear to be any doubt that the Tax Rebate would, at a minimum, be nontaxable for most Arizonans.

### C. The IRS affirmed its February 2023 guidance.

In August 2023, the IRS issued Notice 2023-56 to "describe[] the rules that the [IRS] applies in determining the federal income tax consequences of refunds of State or local taxes and certain other payments made by State or local governments … to individuals." ER-279 ¶ 36; ER-160. In an accompanying statement, the IRS represented that it wished "to provide additional certainty" regarding these rules. ER-157.

10

The IRS explained that "*[m]any of the[] programs were related, directly or indirectly*, to the various consequences of the Coronavirus Disease 2019 (COVID-19) pandemic, and *the programs varied in terms of the types of payments, payment amounts, and eligibility criteria*." ER-279 ¶ 38; ER-160 (emphasis added). The IRS then purported to state that its February 2023 guidance applied only for payments made in 2022. ER-161. But the IRS did not identify a single program that it had found nontaxable for 2022 but would have found taxable in other years based on the criteria that it enunciated. *Id.* Nor did the IRS provide any specific criteria to facilitate such an analysis by taxpayers or policymakers. *Id.*

Rather, the IRS explained generally that payments for the promotion of the general welfare are not includible in the recipient's federal gross income if the payments are from a governmental fund, are for the promotion of the general welfare, and do not represent compensation for services. ER-280 ¶ 41; ER-165. The IRS further explained that payments made in connection with a qualified disaster are presumed to promote the general welfare. ER-280 ¶ 42; ER-165.

The IRS also reiterated that even if an income exclusion does not apply, state tax refunds "generally are not includible in the recipient's Federal gross

11

income because, as the return of an overpayment of the recipient's State tax liability, these refunds are not an accession to wealth." ER-280 ¶ 45; ER-163. The IRS therefore affirmed that such payments will not be subject to federal taxation where (1) the refund is for "State taxes actually paid by the taxpayers"; and (2) the taxpayer has not deducted those state taxes for federal tax purposes in a prior taxable year (e.g., because the taxpayer took the standard federal deduction). ER-280 ¶ 46; ER-162–63. As authority for this rule, the IRS cited *Maines v. Commissioner*, 144 T.C. 123 (2015). ER-280–81 ¶ 47; ER-162.

The IRS's accompanying statement declared even more explicitly, with emphasis, that "**[m]ost taxpayers receiving state tax refunds do not have to include the state tax refund in income for federal tax purposes.** As a general rule, taxpayers who choose the standard deduction on their federal income tax returns do not owe federal income tax on state tax refunds." ER-281 ¶ 48; ER-157 (bold in original).

### D. The IRS unlawfully declared that the Tax Rebate is taxable in full, harming Arizona and its taxpayers.

In December 2023, the IRS orally informed the Arizona Department of Revenue that notwithstanding its determinations concerning materially

12

similar programs just months earlier—and its repeated acknowledgments that tax refunds were generally nontaxable—the Arizona Tax Rebate was federally taxable in full. ER-282 ¶¶ 58-59; ER-194 ¶ 5.

Although this determination had significant public policy consequences for Arizona, the IRS provided no written explanation until February 15, 2024, in response to a letter from Attorney General Kris Mayes challenging the decision. ER-282 ¶ 60; ER-177–79. In the intervening time, the Arizona Department of Revenue had no choice but to convey the IRS's erroneous decision to Arizona taxpayers and to make Form 1099s available to them to report the purported "income" from the Tax Rebate. ER-282 ¶ 61; ER-181; ER-194 ¶ 7.

### E. The IRS provided conflicting rationales for its discriminatory treatment of Arizona.

On February 15, 2024, the IRS participated in a video conference with Arizona stakeholders and sent responsive letters to Attorney General Mayes, Senator Sinema, and Arizona State Senate Majority Leader Petersen that same day. ER-177–79 (Mayes) ER-186-87 (Sinema), ER-189–91 (Petersen). The IRS purported to assure Arizona that its "priority [is] to ensure that the rules concerning income inclusion and exclusion are applied fairly and

13

consistently to every state payment," ER-179, even as it affirmed its inconsistent, discriminatory determination.

## 1. The IRS changed its story about the basis for its exclusion determinations.

The IRS again reiterated that determining whether payment programs qualify for an exclusion requires "a fact-intensive analysis." ER-283 ¶ 67; ER-177. But then, for the first time, the IRS also asserted that its determinations in IR-2023-23 "did not reflect a legal determination as to the proper treatment for each of the payments." ER-283 ¶ 67; ER-177.

Likewise, the IRS had earlier stated that "the particular label given to [a] payment under State law is not controlling for Federal tax purposes," ER-162, and its February 15 letter affirmed this. ER-177 (same). But orally, the IRS disclosed to Arizona stakeholders that, in fact, the IRS deferred to a state law's characterization of its payments as being for the purpose of disaster or COVID-19 relief. ER-283–84 ¶ 68.

## 2. The IRS confirmed its misapprehension about when rebates are taxable income absent an exclusion.

Regarding the fundamental principle that tax refunds generally are not taxable income, the IRS asserted that "[t]he 2023 Arizona tax rebates are not refunds of taxes previously paid for federal tax purposes because the

14

amount paid to taxpayers is not *capped* at the amount of tax previously paid." ER-178 (emphasis added); ER-284 ¶ 70. The IRS purported to rely on *Maines* for its position. ER-178–79.

## II. The district court declined to enter a preliminary injunction on one basis and then dismissed the action on a different basis.

### A. Arizona sued to enjoin the IRS's unlawful determination.

Six days later, on February 21, Arizona filed its complaint for declaratory and injunctive relief to enjoin the IRS's unlawful determinations. ER-273. The complaint pleads statutory and constitutional claims for violation of 26 U.S.C. § 61, violation of Congress's taxing power under the U.S. Constitution, violation of equal sovereignty principles, and violation of the Administrative Procedures Act ("APA"). ER-287–91 ¶¶ 90-122.

Shortly thereafter, Arizona moved for an order to preliminarily enjoin the IRS's unlawful taxation.

### B. The district court declined to enter a preliminary injunction, while acknowledging the merit of Arizona's claims.

At oral argument on the motion for preliminary injunction, the district court stated that it believed Arizona had "established possibly a likelihood of success that the United States cannot tax many of the refunds." ER-235:5-9. In particular, the court found the IRS's rationale for taxing every rebate in

full "unpersuasive … in light of the *Maines* case." ER-235:10-11; ER-250:5–6 (IRS's explanation was "severely wanting"). The court also characterized the IRS's explanations for its inconsistent application of income exclusions as "troublesome." ER-269:17–20.

On April 5, 2024, the district court nonetheless declined to enter a preliminary injunction based exclusively on its determination that the Anti-Injunction Act ("AIA") and this Court's decision applying the AIA in *Confederated Tribes & Bands of Yakama Indian Nation v. Alcohol & Tobacco Tax & Trade Bureau*, 843 F.3d 810 (9th Cir. 2016), "cast[] considerable doubt" on the district court's jurisdiction. ER-228.

The order observed in a footnote that Arizona had relied in part on *Wyoming v. Oklahoma*, 502 U.S. 437 (1992), to assert standing, but it otherwise did not contain a single reference to standing. *See* ER-230 n.2.

### C. The district court erroneously dismissed the action on standing grounds and Arizona timely appealed.

On April 29, the IRS moved to dismiss the action under the Anti-Injunction Act, for purported lack of standing, and on other justiciability grounds. ER-046–56. The IRS also moved for dismissal for failure to state a claim. ER-056–63.

16

This time, the district court held that "Arizona has failed to establish the sufficient injury in fact necessary to confer standing to bring any of its claims" and dismissed exclusively on standing grounds. ER-012. The dismissal order does not reference the AIA or *Yakama Nation*. *See generally* ER-005–12.

On January 10, 2025, Arizona timely appealed. ER-293–94.

## STANDARD OF REVIEW

This court reviews dismissal on standing grounds *de novo*. *Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50, 57 (9th Cir. 2024).

## SUMMARY OF ARGUMENT

**I.** States are entitled to "special solicitude in … standing analysis." *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007); *Arizona v. Yellen*, 34 F.4th 841, 851 (9th Cir. 2022) (same) (hereinafter "*Yellen (AZ)*"). But rather than give Arizona *any* solicitude, the district court improperly credited the IRS's merits arguments and erroneously rejected three bases for standing that separately (and collectively) should have precluded dismissal, as similar allegations have in every other analogous case.

*First*, Arizona is challenging the IRS's taxation of *state* tax rebates that Arizona's Legislature and Governor enacted into law to help state taxpayers

17

during a period of record inflation. By unlawfully imposing a federal tax on the rebates, the IRS interfered with the State's sovereign taxing authority and its ability to make informed policy decisions. *E.g.*, ER-286 ¶¶ 80–81. This alone establishes the State's standing to sue. *Yellen (AZ)*, 34 F.4th at 851 (threat to state's "sovereign prerogative to tax its residents as it sees fit" establishes standing).

*Second*, the taxation was discriminatory. *E.g.*, ER-286, 290 ¶¶ 81, 114–18. The IRS treated 21 states favorably and then, without a reasoned basis, treated Arizona unfavorably—an action that was arbitrary and capricious in violation of the APA and that deprived Arizona of equal sovereignty under the U.S. Constitution.

The IRS cannot dispute its disparate treatment of Arizona—it can only attempt to justify it. Yet in lieu of accepting Arizona's well-pled allegations, the district court made factual determinations on disputed issues as to which the IRS has not even taken consistent positions. Among other improper factual findings, the court determined that "the IRS applied the same 'complex fact intensive inquiry' in deciding whether to impose federal taxes on the Arizona Rebate, just as any other state." ER-011. This was an egregious overreach. The IRS *asserted* in its February 2023 guidance and in

18

later correspondence that its analysis was consistently reasoned and "fact intensive," but more recently it has argued that "[n]o matter what the IRS determined for the 21 states," Arizona's Tax Rebate must "be evaluated on [its] own." ER-062. Whether the IRS had a reasoned basis for granting income exclusions to 17 states but not to Arizona is therefore one of the central disputed issues in this case—not something that can be assumed away at the pleadings stage.

Beyond that, the IRS's second determination—treating the Tax Rebate as a taxable accession to wealth, without regard for the taxes actually paid by individual taxpayers—is not a matter of debatable administrative discretion. It is simply illegal. The district court appeared to understand this at the hearing on Arizona's motion for preliminary injunction, yet it ignored this part of the State's claim entirely in granting the IRS's motion to dismiss.

*Third*, as the U.S. Supreme Court, this Court, and other courts have repeatedly held, the alleged "loss of specific tax revenues" establishes state standing. *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992). Arizona alleged that it would lose an estimated $480,000 in State sales-tax revenue as a result of the IRS's action and supported this claim with declarations from an Arizona Department of Revenue economist. ER-285 ¶¶ 74-77; ER-194 ¶ 6; ER-197–99

19

¶¶ 3-6.  Although the Second Circuit had recently affirmed state standing on closely analogous facts, *New York v. Yellen*, 15 F.4th 569 (2d. Cir. 2021) (hereinafter "*Yellen (NY)*"), the district court once again accepted the IRS's arguments, not Arizona's well-pled allegations. *E.g.,* ER-009 (opining that Arizona's calculation depends on "assumptions regarding how the taxpayers would have spent their money"). And the court inexplicably relied exclusively on miscellaneous inapposite cases, while ignoring controlling authority and *Yellen (NY)* entirely. ER-008–09.

**II.** There is no alternative justiciability or pleadings ground on which to affirm the district court's dismissal. At the preliminary injunction stage, the district court declined to issue an injunction based solely on the Anti-Injunction Act and this Court's decision in *Yakama Nation*. ER-228–31. But *Yakama Nation* concerned an Indian tribe's challenge—in concert with private parties—to the taxation of private tobacco income, *not* to a governmental payment. In contrast, *South Carolina v. Regan*, 465 U.S. 367 (1984)—the case that created the pertinent exception to the AIA—held that South Carolina could sue to enjoin taxation of state bearer bond payments because the state lacked any alternative avenue to challenge the tax. *Regan*, not *Yakama Nation*, is directly on point and controls this case—as the district

20

court appeared to recognize in abandoning the AIA as a basis for dismissal. The additional sovereign immunity and finality arguments that the IRS made below similarly fail.

Further, as the district court previously acknowledged, Arizona has pled meritorious claims for relief. ER-235:5–6 ("I do believe that you have established possibly a likelihood of success …"). Under the IRS's own authority, only the "*excess portion*" of a tax refund "that remains after first reducing state-tax liability . . . is an accession to the [taxpayer's] wealth, and [includible] in . . . federal gross income." *Maines*, 144 T.C. at 136 (emphasis added). The IRS's taxation of every Tax Rebate given to every taxpayer, without regard to taxes actually paid, was therefore flatly illegal.

And there are, at a minimum, issues of disputed fact regarding whether the IRS had a reasoned basis for giving 17 states the benefit of income exclusions under its purported "fact-intensive inquiry" while denying the benefit of any exclusion to Arizona. The IRS's erratic positions in this litigation—asserting, for example, that it does not credit Legislative labels, and then saying the opposite orally and in briefing—have, moreover, only tended to support Arizona's allegations.

This Court should reverse.

21

## ARGUMENT

## I.    Arizona has standing to bring its claims.

States may sue the federal government to vindicate their sovereign interests, and they "enjoy[] special solicitude in … standing analysis." *Yellen (AZ)*, 34 F.4th at 851 (cleaned up) (citing *Massachusetts*, 549 U.S. at 520). Further, a plaintiff's factual allegations must be accepted as true—with all reasonable inferences drawn in the nonmovant's favor—on a Rule 12(b)(1) motion. *Pride v. Correa*, 719 F.3d 1130, 1133 (9th Cir. 2013).

Although Arizona alleged sovereign injury arising out of the IRS's discriminatory interference with the State's policy prerogative, as well as tax-loss injury, *e.g.*, ER-285–86, 290 ¶¶ 77, 81, 117, the district court ignored these well-pled allegations and erroneously dismissed the action.

### A.    The IRS's interference with Arizona's sovereign taxing prerogative establishes standing.

This Court has already held that Arizona has standing when the federal government threatens its "sovereign prerogative to tax its residents as it sees fit." *Yellen (AZ)*, 34 F.4th at 851. Arizona's present lawsuit implicates this exact issue. Arizona tried to return tax dollars to its taxpayers, and the IRS swooped in to take a cut of it—not only by denying Arizonans the benefit of income exclusions, but also by illegally treating tax rebates as

22

an accession to wealth. Thus, Arizona did not have the opportunity to "pursue[] alternate policies that would not have resulted in the [illegal tax] being siphoned from Arizona." ER-286 ¶ 80. And given the determination's capriciousness, Arizona cannot "make informed budgetary decisions" in the future. ER-286 ¶ 81.

Arizona's injury here is, if anything, more concrete than it was in *Yellen (AZ)*, which was a pre-enforcement challenge by Arizona to a law empowering the federal government to recoup pandemic-relief funds if a state enacted a tax cut. 34 F.4th at 847. Although the government had not yet taken any action, this Court nonetheless recognized that Arizona had alleged "serious consequences in losing control over its taxing policies" and that the Court needed to "take Arizona's allegations to be true" at the litigation's "early juncture." *Id.* at 853.

Here, the IRS has already undertaken the unlawful action at issue. Further, while Arizona argued that the recoupment provision at issue in *Yellen (AZ)* was "unconstitutionally ambiguous," *id.* at 847, the issue here is that the IRS's very-recent guidance had *unambiguously* found materially similar state tax refunds nontaxable—and then the IRS sprung the tax on Arizona, anyway. Irrespective of whether the federal action is a direct

penalty provision (*Yellen (AZ)*) or a tax on State payments (this case), the impact is effectively the same: State funds that could have been used entirely for the benefit of the State and its taxpayers are instead diverted to the federal government, taking control of Arizona's tax policy away from the State. *Yellen (AZ)*, 34 F.4th at 852 ("intangible harms" to policy prerogatives "can be concrete"); *Kentucky v. Biden*, 23 F.4th 585, 598 (6th Cir. 2022) ("States … have sovereign interests to sue when they believe that the federal government has intruded upon areas traditionally within states' control.").

Arizona, moreover, suffered additional sovereign injury that was not present in *Yellen (AZ)* or other cases where courts have found state standing: the State was compelled to "convey the IRS's erroneous decision to Arizona taxpayers and to make Form[s] 1099[-MISC] available to them to report the purported 'income' from the Tax Rebate." ER-282 ¶ 61.

The IRS has argued that Arizona would have needed to issue Forms 1099-G in any event, ER-049–50, but that is both wrong and obtuse. If the IRS had lawfully applied the rule that tax refunds are generally nontaxable—but had not granted an exclusion—the IRS is correct that Arizona would have needed to issue Forms 1099-G so that the subset of taxpayers who had federally deducted their state taxes could report the refunds. 16 U.S.C. §

24

6050E. But if the IRS had granted the same income exclusions that 17 other states received, the rebates would have been wholly nontaxable for all taxpayers, rendering Forms 1099-G unnecessary. *See id.* Beyond that, the sovereign injury is *not* the mere issuance of forms; rather, it is that the IRS enlisted Arizona to communicate the *unlawful* determination to Arizona taxpayers and to facilitate the *unlawful* taxation by issuing Forms 1099-MISC.

## B. The IRS's discriminatory treatment of Arizona establishes standing.

The IRS did not merely make an unlawful determination as to Arizona in isolation—rather, the IRS administratively gave 21 states favorable treatment, and then it discriminated against Arizona a few months later. The IRS's unlawful determination was thus "so arbitrary, capricious, and inequitable as to constitute an unlawful targeting of Arizona." ER-286 ¶ 81; ER-290 ¶ 117 ("There was no valid, logical or reasoned basis for the IRS to subject Arizona to disparate treatment by subjecting the Tax Rebate to federal taxation after having determined that materially similar payments and rebates issued by other states were not subject to federal taxation."); ER-290 ¶¶ 114–18 (pleading equal sovereignty claim).

25

"[T]he fundamental principle of equal sovereignty remains highly pertinent in assessing subsequent disparate treatment of States." *Shelby Cnty. v. Holder*, 570 U.S. 529, 544 (2013); *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009) ("a departure from the fundamental principle of equal sovereignty requires a showing that a [law's] disparate geographic coverage is sufficiently related to the problem that it targets"). States therefore establish standing to pursue an equal sovereignty claim by pleading a violation that was "akin to the type of dignitary injury recognized in equal protection cases." *Ohio v. EPA*, 98 F.4th 288, 307 (D.C. Cir. 2024). This is exactly what Arizona has alleged, and there was "no reason under normal juristic standards for [the court] to dispute, deny, or discredit" these allegations. *Yellen (AZ)*, 34 F.4th at 851.

Yet the district court again gave solicitude to the IRS's *arguments* rather than to Arizona's allegations. The district court found—at the pleadings stage—that:

- "[T]he IRS applied the same 'complex fact intensive inquiry' in deciding whether to impose federal taxes on the Arizona Rebate, just as any other state." ER-011.

26

- "The IRS's February 2023 guidance … applied to only the 21 states that made special, one-time payments in the 2022 tax year." ER-010.

- In May 2023 when Arizona enacted its rebate, "the effects of COVID were different than they were in the 2022 tax year." *Id.*

There are multiple serious problems with these "findings," each of which renders dismissal erroneous.

### 1. There is no evidence—let alone uncontroverted evidence—that the IRS made consistent reasoned decisions.

Factual findings that contradict or negate well-pled allegations are always improper at the pleadings stage. *See, e.g., Seattle Pacific University*, 104 F.4th at 57 ("we rest our analysis on the Complaint's allegations, which we accept as true at the pleading stage" in assessing standing). In this instance, the district court's error is particularly egregious because it credited the IRS for a factual position that the IRS has largely abandoned.

The IRS stated in its February 2023 guidance that "[d]etermining whether payments qualify for these exceptions is a complex fact intensive inquiry that depends on a number of considerations," ER-101, thus *implying* that it had undertaken reasoned analyses and would continue to do so. *See*

27

*also* ER-177 (representing to Attorney General Mayes that "numerous states had adopted a variety of payment programs requiring a fact-intensive analysis to determine whether they qualified for an exclusion").

But even as the IRS continued to credit itself for "fact-intensive analysis," it also told Attorney General Mayes that its February 2023 determinations "did not reflect a legal determination as to the proper treatment for each of the payments." ER-177. Claiming to have performed a detailed factual analysis while disclaiming the legal consequence of that analysis is nonsensical on its face. Arizona therefore put the veracity of these contentions at issue in the complaint. ER-277, 283 ¶¶ 21–22, 64–67 (alleging that "policymakers could … only reasonably conclude [based on the IRS's purported "factual analysis"] that similarly situated states would receive similar treatment and would not be discriminated against").

More recently, the IRS has oscillated between its "complex inquiry" narrative on the one hand, and suggesting that it has unfettered discretion to make inconsistent determinations on the other hand. *See* ER-062 (arguing that "[n]o matter what the IRS determined for the 21 states," Arizona's Tax Rebate must "be evaluated on [its] own"). Similarly, the IRS's pre-litigation position was that "the label given to a payment under state law is not

controlling for federal tax purposes." ER-162; ER-177. Yet the IRS said the opposite to Arizona orally, and the IRS's briefing recites a litany of "labels" that supposedly could have resulted in a different determination for Arizona. ER-283–84 ¶ 68; ER-061; *see also infra* Section II(B)(2)(b).

The IRS closed its letter to Attorney General Mayes by assuring her "that it is the IRS's priority to ensure that the rules concerning income inclusion and exclusion are applied fairly and consistently to every state payment and that the IRS is applying the rules reflected in this letter and in Notice 2023-56 to similar programs in other states as well as to Arizona." ER-179. Was that a true statement? This question goes to the heart of Arizona's equal sovereignty and APA claims—yet, with the wave of a hand, the district court unilaterally determined that the IRS had treated Arizona the "same" as other states, and thereby improperly resolved this central disputed issue in the IRS's favor.

### 2. There is nothing special about a particular calendar year.

The district court also got out over its skis in finding that the IRS's February 2023 determinations were limited to 2022 tax refunds—and by assuming that this purported limitation was legally meaningful. *See* ER-010. ("Arizona fails to reference a single state that made a one-time payment in

the 2023 tax year but received different treatment than Arizona received from the IRS.")

The IRS said many different things in its February 2023 guidance, and one key sentence is 139 words long. In that sentence, the IRS stated in part that because "the pandemic emergency declaration is ending in May[] 2023 … this [is] an issue only for the 2022 tax year." ER-101. There are a few observations to make about this.

*First*, the IRS did *not* state that the determinations would apply only in the 2022 tax year. Rather, it purported to assess the duration for which the determinations would be "an issue."

*Second*, the assessment does not make much sense, given that the IRS has also indicated that some of the payment programs that it approved as tax free were not even indirectly related to the pandemic. ER-160 ("*[m]any* of these programs were related, directly or indirectly" to the pandemic) (emphasis added). But even if all the determinations had been tethered to the pandemic emergency — and the emergency remained in effect until May 2023 — then commonsense would dictate that the determinations would be "an issue" through at least May 2023.

30

*Third*, even if the IRS had expressly purported to limit the determination to a particular calendar year—as it later did in the August 2023 Notice, ER-161, after Arizona had already enacted the Tax Rebate—that itself would be arbitrary and capricious. Making a supposedly reasoned, fact-intensive determination—and then arbitrarily limiting it to a calendar year—would be an irrational thing for a court to do, and it makes no more sense for the IRS.

*Fourth*, in an apparent effort to graft a degree of rationality onto the time limitation, the district court also found that "the effects of COVID were different [in early 2023] than they were in the 2022 tax year." ER-010. But that is a baffling finding to make at the pleadings stage, especially when the complaint alleges that Arizona enacted the Tax Rebate while the COVID emergency was still in effect to combat record inflation arising from "market disruptions largely caused by the COVID-19 pandemic." ER-278, 288 ¶¶ 32-33, 96; *see also* ER-100 (state payments approved as tax free were "related to the pandemic and its associated consequences"). Whether "the effects of COVID" changed between 2022 and 2023 is neither at issue in the pleadings nor relevant in any discernible way.

31

### 3. The IRS does not have discretion to illegally tax nonincome.

Underlying all of the district court's analysis is the assumption that the IRS had discretion to subject Arizona to disparate treatment, so long as the administrative decision-making was defensible. But the IRS had no discretion to illegally tax nonincome. *See* U.S. Const. amend. XVI; 26 U.S.C. §§ 1, 61. And that is exactly what it did in treating *every* Arizona Tax Rebate as an accession to wealth, irrespective of whether a particular taxpayer's refund exceeded taxes actually paid (and irrespective of whether the taxpayer had federally deducted state taxes).

The IRS has repeatedly acknowledged that state tax refunds "generally are not includible in the recipient's Federal gross income because, as the return of an overpayment of the recipient's State tax liability, these refunds are not an accession to wealth." ER-163. But the IRS—relying on *Maines v. Commissioner*—refused to give Arizona the lawful benefit of this rule on the purported basis that the Tax Rebate was not *capped* at taxes actually paid. As the district court recognized at the preliminary injunction stage, ER-250:5-6, *Maines* plainly holds that only the "*excess portion*" of a tax refund "that remains after first reducing state-tax liability … is an accession to the

32

[taxpayer's] wealth, and [includible] in … federal gross income." 144 T.C. at 136 ("[i]t is only the potentially refundable excess credits that must be included in gross income") (emphasis added).

The IRS therefore mischaracterized its own legal authority and discriminated against Arizona in an egregious manner that cannot be explained away based on the changing calendar year or any other factor. *See also infra* Section II(B)(1).

### C. Arizona's specific tax-loss injury establishes standing.

The alleged "loss of specific tax revenues" also establishes a state's standing. *Wyoming*, 502 U.S. at 448 (distinguishing cases where party did not allege a specific tax loss); *City of Oakland v. Lynch*, 798 F.3d 1159, 1164 (9th Cir. 2015) ("An expected loss of tax revenue can constitute a sufficient injury for purposes of Article III standing.").

Here, Arizona alleged that by taxing the Tax Rebate, the IRS unlawfully took about $20.8 million from State residents, thereby costing the State approximately $480,000 in transaction privilege tax (i.e., sales tax) revenue that the State would have received if that money had remained in Arizona. ER-285 ¶¶ 74-77. And Arizona has supported this allegation with two declarations from an experienced Department of Revenue economist.

33

ER-193–94; ER-197–99 (calculation relies on data regarding federal tax brackets and data regarding Arizonans' payment of sales tax at different income levels).

But rather than accept Arizona's well-pled allegations, the district court characterized the alleged injury as "derivative and speculative," and refused to credit it. Both aspects of this characterization are misplaced.

While the court used the word "derivative" pejoratively, what the court actually described was a causation question that should not have been resolved against Arizona at the pleadings stage. *See, e.g., Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 770 (9th Cir. 1981) ("[c]ausation is generally a question of fact"). As the relevant cases make clear, *every* tax-loss injury necessarily occurs through a causal chain, and disputed causation issues do not negate standing.

*Wyoming v. Oklahoma* concerned Oklahoma's passage of an Act requiring Oklahoma coal-fired electric plants to burn a coal mixture with at least 10% Oklahoma-mined coal. 502 U.S. at 440. Wyoming was "a major coal-producing state" and it imposed a severance tax on coal extracted from the state. *Id.* at 442. Before Oklahoma passed its Act, Oklahoma utilities had purchased nearly all of their coal from Wyoming; after passage they

34

purchased somewhat less, allegedly costing Wyoming about $500,000 in severance tax revenue per year. *Id.* at 445.

In an original action under the Commerce Clause, a Special Master denied Oklahoma's motion to dismiss on standing grounds and later denied its motion for summary judgment. *Id.* at 446. Oklahoma made "much of the fact that the mining companies affected in Wyoming could bring suit raising the Commerce Clause challenge, as private parties aggrieved by state action often do." *Id.* at 451. Rejecting Oklahoma's argument that Wyoming had not suffered cognizable "direct injury," the Supreme Court agreed that "Wyoming clearly had standing to bring [the] action." *Id.* at 447.

As the Court explained, "[e]ven if such action [by a private party] were proceeding … Wyoming's interests would not be directly represented." *Id.* at 452. Wyoming's allegations constituted "a direct injury in the form of a loss of specific tax revenues." *Id.* at 448. And while "the taxes lost … amounted to less than 1% of revenues received by Wyoming," they were not "*de minimis.*" *Id.* at 453 n.11. After finding standing, the Court granted Wyoming's summary judgment motion and held the Act unconstitutional under the Commerce Clause. *Id.* at 461.

35

Likewise, in *New York v. Yellen*—a recent and closely analogous case—the Second Circuit held that New York and other states had standing to sue the IRS for imposing a $10,000 cap on the state and local tax ("SALT") deduction. 15 F.4th at 575–77. In *Yellen (NY)*, the causal theory supporting tax-loss standing had at least five steps: (1) Congress imposes the SALT deduction cap, limiting the federal tax deduction available to taxpayers; (2) which "makes homeownership more expensive"; which (3) "reduces demand in the housing market"; which (4) "caus[es] lower prices and fewer sales"; which ultimately (5) "leads to specific losses in tax revenue derived from property and real estate transfer taxes." 15 F.4th at 576.

The causal chain underlying Arizona's allegation is simpler and more direct: (1) the IRS unlawfully taxes the Tax Rebate; (2) which takes money from Arizona taxpayers; which (3) results in a predictable and calculable loss of sales tax that the State would have collected if the unlawfully taxed amount had remained in Arizona. ER-285 ¶¶ 74-77; ER-197–99. In labeling these allegations "speculative," the district court found that they "depend[] on a number of assumptions regarding how the taxpayers would have spent their money otherwise." ER-009. But nitpicking Arizona's allegations in this manner was, at a minimum, premature. *Yellen (AZ)*, 34 F.4th at 849

36

("standing in no way depends on the merits"); *New York v. Mnuchin*, 408 F. Supp. 3d 399, 410 (S.D.N.Y. 2019) ("Perhaps a full evidentiary record would reveal that the States' theory of [tax loss] injury is not borne out by reality. But for purposes of withstanding the Government's Rule 12(b)(1) motion, the States have alleged an injury that, if proved," confers standing.).

And in any case, there is no rule that an injury must be *large* to confer standing. *See, e.g., United States v. Students Challenging Regul. Agency Procs. (SCRAP)*, 412 U.S. 669, 689 n.14 (1973) ("The basic idea that comes out in numerous cases is that an identifiable trifle is enough for standing.") (cleaned up); *Wyoming*, 502 U.S. at 453 n.11. Thus, even if the IRS could show in discovery that Arizona's loss was much smaller, Arizona would still have standing. And it was particularly inappropriate for the district court to quibble over Arizona's "assumptions" here because, as in *Yellen (NY)*, "basic economic logic" supports the injury that Arizona alleged. 15 F.4th at 577 (cleaned up); *Mnuchin*, 408 F. Supp. 3d at 409 ("states, no less than private citizens, are entitled to invoke" expected financial loss to support standing).

The other tell that the district court got this wrong is the authority that it chose to rely on. Although Arizona had relied heavily on *Yellen (NY),* the court did not even reference that case or make any effort to distinguish it.

37

Instead, the court relied exclusively on cases where states had alleged only generalized tax loss or where the claim lacked basic economic logic. *See State of Fla. v. Mellon*, 273 U.S. 12, 17-18 (1927) (challenging enactment of federal inheritance tax, Florida alleged that "the act will have the result of inducing potential taxpayers to withdraw property from the state, thereby diminishing the subjects upon which the state power of taxation may operate"); *Kansas v. Biden*, 736 F. Supp. 3d 1020, 1043 (D. Kan. 2024) ("Plaintiffs allege the Final Rule will reduce their tax revenue because it shifts loan forgiveness forward in time."); *Com. of Pa., by Shapp v. Kleppe*, 533 F.2d 668, 671 (D.C. Cir. 1976) ("petitioners appear to assert that the state suffered harm by injury to the economy, health, safety, and welfare of its people, by impairment of its ability to look after the well-being of its citizens, and by reduction of state tax revenues").

The district court's final case, *XY Planning Network, LLC v. United States Securities and Exchange Commission*, was a joint challenge by private parties and several states to a new broker-dealer fiduciary rule promulgated by the Securities and Exchange Commission. 963 F.3d 244, 247-48 (2d. Cir. 2020). As described in the opinion, the states' tax-loss theory was that the new regulation would "diminish their tax revenues from investment income by

38

allowing broker-dealers to provide conflicted investment advice to customers, which would be prohibited under a uniform fiduciary standard." *Id.* at 250. While the states apparently tried to support their theory with "speculative economic data," *id.* at 253 (cleaned up), there was no facially logical connection between a non-monetary broker-dealer fiduciary rule and state tax loss.

Those facts stand in stark contrast to the economic logic supporting the claims in *Wyoming*, *Yellen (NY)*, and this case. The tax loss stemming from a new fiduciary rule might well be zero; here, in contrast, the IRS cannot plausibly dispute that taking over $20 million out of Arizona caused the State to suffer at least *some* tax-loss injury, even if the quantum differs from what Arizona has alleged. *See, e.g., Thomas v. Cnty. of Humboldt, California*, 124 F.4th 1179, 1189 (9th Cir. 2024) ("Plaintiffs do not need to demonstrate that it is 'literally certain' that the harms they identify will materialize," and possible reduction in harm does not negate standing).

It is also telling that the Second Circuit decided *Yellen (NY)* a year after *XY Planning* and did not find *XY Planning* worth citing—yet the district court in this case ignored the more recent federal-tax decision and relied on the earlier fiduciary-rule case.

39

## II.   No alternative justiciability or pleadings argument supports dismissal.

The district court declined to enter a preliminary injunction in this case solely in reliance on the Anti-Injunction Act—and then the court did not even mention the AIA in its dismissal order. As the court likely came to recognize, the AIA is inapplicable here and provides no basis for dismissal. The IRS's other justiciability arguments below likewise fail to provide any alternative basis for dismissal.

Nor is there any basis to affirm dismissal based on any purported pleading defect. Indeed, the district court's dismissal on standing grounds was particularly misguided because the court acknowledged that Arizona had "established possibly a likelihood of success that the United States cannot tax many of the refunds." ER-235:5–9.

### A.   The IRS's alternative justiciability arguments fail.

#### 1.   The Anti-Injunction Act does not bar Arizona's suit.

While the AIA generally precludes suits to enjoin tax collection, 26 U.S.C. § 7421(a), it does not bar "actions brought by aggrieved parties for whom [Congress] has not provided an alternative remedy." *Regan*, 465 U.S. at 378.  Arizona lacks any alternative remedy, ER-287 ¶ 89, and its suit falls directly within the *Regan* exception.

40

(a) **The *Regan* exception allows suits by states to vindicate their sovereign interests.**

*Regan* concerned South Carolina's challenge to a new federal tax on state bearer bond interest. Congress had historically "exempt[ed] from a taxpayer's gross income the interest earned on the obligations [i.e., bonds] of any State." 465 U.S. at 370. However, Congress changed the law to exempt only "registered" bonds, while subjecting "bearer" bonds to taxation, and South Carolina sued to enjoin the tax. *Id.* at 370–72. The Supreme Court held that the AIA did not bar the claim because Congress had "not provided the plaintiff with an alternative legal way to challenge the" tax, *id.* at 373, establishing the exception applicable here. The facts and circumstances in *Regan* parallel those in Arizona's suit in every material respect.

**Claim by a state.** *Regan* involved a claim by a state—not a private party or other governmental unit—against the federal government. Again, states are "entitled to special solicitude." *Massachusetts*, 549 U.S. at 520.

**Federal tax on state residents' income.** In declining to enter a preliminary injunction, the district court sought to distinguish *Regan* on the basis that Arizona's claim is "derivative" of taxpayer claims, while South Carolina's was not. ER-228–29. But that purported distinction makes no legal

41

or logical sense. South Carolina's alleged injury arose from Congress's decision to tax interest on bearer bonds issued by the state and held by state residents. 465 U.S. at 370–72. Arizona's alleged injury arises from the IRS's decision to tax Tax Rebates issued by the State and received by State residents. The suggestion that Arizona's claim is "derivative" therefore directly contradicts *Regan's* reasoning and is unavailing. *See id.*

**Alleged harm to state's sovereign interests.** South Carolina argued "that the practical effect of [the tax law was] to require it to issue its obligations in registered form," thereby "destroy[ing] its freedom to issue obligations in the form that it chooses." *Id.* at 372. Otherwise, it would need to "pay its bondholder a higher rate of interest on" bearer bonds. *Id.* at 371.

The IRS has tried to distinguish *Regan* on the basis that "the sovereign interest in *Regan* went to the *state's* issuance of bonds in a form that would require the *state* to pay more," ER-055, but this purported distinction is also nonexistent. If the IRS unlawfully taxes Arizona's tax rebates, Arizona has the same three choices that South Carolina had: (1) do nothing, and watch state money get sucked into federal coffers; (2) change state policy (i.e., never return taxpayer money or do so under a different framework and hope that the result is different); or (3) to the extent Arizona wants to return a specific

42

dollar amount to taxpayers, increase the rebate amount to compensate for unlawful federal taxation.

Arizona pled this harm, which leaves Arizona and South Carolina situated almost identically. *See* ER-286 ¶ 80 ("State could have pursued alternate policies that would not have resulted in the Unlawfully Taxed Amount being siphoned from Arizona."); *id.* ¶ 81 ("IRS's unlawful determination … deprives Arizona of its right to make informed budgetary decisions in [its] best interests.").[3]

> (b) ***Yakama Nation* is distinguishable and must be read with *Regan*.**

The district court's preliminary injunction order relied substantially on this Court's decision in *Yakama Nation* holding that the AIA barred an Indian tribe from suing to enjoin a tobacco tax. ER-228–30. This reliance on *Yakama Nation* (and not *Regan*) was misplaced.

_____

[3] While *Regan* does not separately analyze standing, the fact of South Carolina's standing—whether it was assumed or resolved elsewhere in the proceedings—also supports Arizona's standing here, given *Regan's* closely analogous facts. *Cf. Regan*, 465 U.S. at 401 ("the State *qua* State has demonstrated that it has no adequate alternative forum in which to raise its unique Tenth and Sixteenth Amendment claims").

*Yakama Nation* was a very different case than *Regan* or this one. For one thing, the plaintiff was an Indian tribe, not a state, and it was therefore not entitled to the same solicitude that states should receive under *Massachusetts v. EPA*. Further, the tax at issue in *Yakama Nation* was a tobacco excise tax imposed on a tobacco manufacturer, 843 F.3d at 812 — i.e., a run-of-the-mill tax on private income, not a tax on interest from sovereign bonds (*Regan*) or on state tax rebates (this case). The sovereign interest in the latter cases is therefore manifestly greater. *See Regan*, 465 U.S. at 372.

This Court held in *Yakama Nation* that the AIA barred the tribe's suit because its claims were "wholly derivative of any injury suffered" by the private parties. 843 F.3d at 815. *Regan*, however, grounds its analysis in whether the "plaintiff" — not some other party — has an alternative means to challenge a tax's validity. 465 U.S. at 373. As the Supreme Court held, the AIA's

> purposes and the circumstances of … enactment … demonstrate that Congress did not intend the Act to apply where an aggrieved party would be required to depend on the mere possibility of persuading a third party to assert his claims. Rather, the [AIA] was intended to apply only when Congress has provided an alternative avenue for an *aggrieved party to litigate its claims on its own behalf*.

44

*Id.* at 381 (emphasis added). Courts should therefore exercise extreme caution before finding that the AIA bars a party's suit because another party could potentially bring similar claims. But to the extent there is any room under *Regan* for an inquiry into whether claims are "derivative," *Yakama Nation* may have been such an outlier case because the tribe, the manufacturer, and the tribal member pled identical claims seeking identical relief. *See* Case No. 2:11-03038-RMP, Dkt. 16 ¶¶ 6.1-6.30 (*Yakama Nation* complaint); *Yellen (NY)*, 15 F.4th at 579 (distinguishing *Yakama Nation*).

Contrary to the district court's characterization, Arizona's claims are *not* wholly derivative of taxpayer claims. Here, as in *Yellen (NY)*, individual taxpayer suits "would neither restore the lost state tax revenue nor free the States from what they allege is federal oversight over their state fiscal policies." 15 F.4th at 579. As *Regan* also recognized, "instances in which a third party may raise the constitutional rights of another are the exception rather than the rule." *Id.* at 380; *Mnuchin*, 408 F. Supp. 3d at 412 (taxpayer suits would not "afford the State[] … an opportunity to assert the sovereign interests that are threatened" by an unlawful tax). Any suggestion that Arizona's constitutional claims can be tossed aside because they are related to hypothetical taxpayer refund claims is therefore plainly wrong. *Yellen*

45

*(NY)*, 15 F.4th at 579 (no AIA bar where "the Plaintiff States — like South Carolina in *Regan* — contend that the SALT deduction cap violates their own constitutional rights"). Extending *Yakama Nation* to the facts in this case would therefore be erroneous, and it would also create a direct split with the Second Circuit.[4]

      (c)   **The *Enochs v. Williams Packing* exception also applies.**

The AIA is also inapplicable "if it is clear that under no circumstances could the Government ultimately prevail … [and] equity jurisdiction otherwise exists." *Enochs v. Williams Packing & Nav. Co.*, 370 U.S. 1, 7 (1962). This is a high bar, but Arizona meets it here with respect to at least the IRS's unlawful taxation of nonincome. *See infra* Section II(B)(2); ER-250:5-6 (IRS's "explanation is severely wanting").

---

[4] Because South Carolina and the plaintiff states in *Yellen* challenged laws enacted by Congress that applied equally to all states, the plaintiffs lost on the merits in both cases. *See South Carolina v. Baker*, 485 U.S. 505, 512-13 (1988) ("South Carolina has not even alleged … that it was singled out …"); *Yellen (NY)*, 15 F.4th at 582-84. Given the Arizona suit's facial merit, *see, e.g.*, ER-248:7–13, it is particularly unjust to subject the State to a higher justiciability bar than any other state has faced. Even in *Yakama Nation*, this Court had no trouble finding that the Tribe had standing to sue. 843 F.3d at 989 (alleged "infringement on … tribal sovereignty and right to self-government as guaranteed by treaty" was "sufficiently concrete, particularized, and imminent to" establish standing).

(d)   **An exception under the AIA also applies to the Declaratory Judgment Act ("DJA").**

*Regan* did not reach the DJA, *see* 465 U.S. at 370 n.2, but other courts have understood the *Regan* exception to apply equally to the DJA. *See, e.g.,* *Yamaha Motor Corp., U.S.A. v. United States*, 779 F. Supp. 610, 614 (D.D.C. 1991) (explaining that *Regan* creates an "exception to the bar of the [AIA] and [DJA], opening the courts only to parties in pre-enforcement tax disputes for whom [Congress] has not provided an alternative remedy") (cleaned up); *Burns v. McGill*, No. 3:98-1150, 1999 WL 1090818, at *4 (M.D. Tenn. Oct. 13, 1999) (same). In any event, it is undisputed that a party may sue "to restrain the assessment or collection of [a] tax" if the *Regan* or *Williams* exceptions apply. *See* IRS, *Suits Against the United States*, at § 5.17.5.4(2), https://www.irs.gov/irm/part5/irm_05-017-005.

### 2.   Any sovereign immunity arguments are unavailing.

The APA "enacted a broad, unqualified waiver for all non-monetary claims for relief against federal agencies." *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1172 (9th Cir. 2017) (citing 5 U.S.C. § 702); *Williams v. Bernhardt*, No. CV-20-02277-PHX-MTL, 2021 WL 2555435, at *2 (D. Ariz. June 22, 2021) (waiver applies broadly "in contexts where the plaintiff seeks 'relief

other than money damages' for claims 'that an agency or an officer or employee thereof acted or failed to act in an official capacity'") (citation omitted).

After ignoring this unqualified waiver in its preliminary injunction briefing, the IRS then pivoted in its motion to dismiss to arguing that Arizona seeks "monetary" relief in the form of "refunds." ER-051 n.4. But that is obviously wrong. Only individual taxpayers can seek refunds; Arizona seeks "declaratory and injunctive relief," not refunds or damages. *See* ER-275, 291 ¶ 8, Prayer for Relief.

The only case that the IRS has cited on this issue—*King Mountain Tobacco Co., Inc. v. Alcohol & Tobacco Tax & Trade Bureau*—was the district court case in *Yakama Nation* and it is inapposite. There, again, a tobacco manufacturer and other plaintiffs sought a declaration that they were "entitled to a refund and/or abatement of all monies … paid to date," which the district court understood as "equivalent to a request for monetary relief." No. CV-11-3038-RMP, 2012 WL 12951864, at *3 (E.D. Wash. Sept. 24, 2012). That is not the relief Arizona seeks, further illustrating why it would be error to rely on that case. And to the extent *King Mountain* suggests that tax refunds to taxpayers can ever constitute "monetary damages," that is

48

also wrong. *See, e.g., In re Texas Ass'n of Pub. Schools Prop. & Liability Fund*, 598 B.R. 570, 580 (W.D. Tex. 2019) ("the Court can only conclude that a refund of illegally acquired taxes is not 'damages' or 'monetary damages,' but is instead equitable relief").

The IRS's related effort below to characterize its determination as something other than "final" for the purpose of APA review is also meritless. *See* ER-051–52. An action is final if it (1) "mark[s] the consummation of the agency's decision-making process"; and (2) is "one by which rights or obligations have been determined or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). "The finality element must be interpreted in a pragmatic and flexible manner." *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (assessing finality based on whether action is a definitive statement of agency's position, has a direct and immediate effect on operations of party seeking review, or if immediate compliance is expected).

Here, the Commissioner made a "*determination* that the 2023 Arizona Families Tax Rebate payments *constitute income* to the recipients for federal income tax purposes" and stated that the "IRS is *applying the rules reflected in this letter … to Arizona*." ER-177, 179 (emphasis added). And contrary to the

49

IRS's refrain that it merely gave "advice" that expressed an "administrative position," ER-047, 052, a letter that establishes an agency's official position on how the law applies to a party's specific facts is a final determination. *See, e.g.*, *Ipsen Biopharmaceuticals, Inc. v. Azar*, 943 F.3d 953, 959 (D.C. Cir. 2019) (finding letter applying law to party's specific facts was final); *cf. Yellen (AZ)*, 34 F.4th at 850 (failure to "disavow[] enforcement … is evidence of" enforcement intent, particularly where Secretary of the Treasury "wrote a letter" to the Arizona Attorney General "confirming … enforce[ment]").[5]

## B. Arizona has stated meritorious claims that cannot be dismissed at the pleadings stage.

The IRS has authority to tax *income* from whatever source derived. U.S. Const. art. I, § 8, Amend. XVI; 26 U.S.C. §§ 1, 61; *see also Comm'r v. Glenshaw Glass Co.*, 348 U.S. 426, 431 (1955) (explaining that "undeniable accessions to wealth, clearly realized, and over which the taxpayers have complete dominion" are taxable as gross income, unless an exclusion applies). The IRS

---

[5] *See also, e.g.*, *Idaho Rivers United v. U.S. Forest Serv.*, 857 F. Supp. 2d 1020, 1025–26 (D. Idaho 2012) (letters rejecting request and allowing for certain conduct to continue had "both a practical effect and a legal consequence"); *S. Utah Wilderness All. v. Off. of Surface Mining Reclamation & Enf't*, 620 F.3d 1227, 1244 (10th Cir. 2010) (letter denying request for a discrete agency action was reviewable as final action).

has no power, however, to tax non-income or to tax gross income when it qualifies for an exclusion. The IRS's determination regarding the Tax Rebate violates both principles and is therefore unlawful.

### 1. A rebate of state taxes paid is not a taxable accession to wealth.

The IRS has repeatedly instructed taxpayers that "State tax refunds generally are not includible in the recipient's Federal gross income because, as the return of an overpayment of the recipient's State tax liability, these refunds are not an accession to wealth." ER-163 (IRS Notice 2023-56); ER-101 (IR-2023-23); ER-157 (IR-2023-158) ("**Most taxpayers receiving state tax refunds do not have to include the state tax refund in income for federal tax purposes**.") (bold in original). As the IRS has further instructed, this rule applies unless an individual taxpayer has federally deducted state taxes and thereby received a federal benefit from them. *See, e.g.*, ER-163.

Yet, the IRS refused to give Arizona taxpayers the benefit of this rule based on the mischaracterization of its own authority. According to the IRS, *Maines* held that refunds are nontaxable only "where the refundable credit amount *was limited* to State taxes actually paid by the taxpayer." ER-162 (emphasis added); ER-179 (asserting that *Maines* "held that two [tax] credits

that were not limited to the amount of taxes previously paid by the taxpayers did *not* constitute refunds for federal income tax purposes").

But as the district court recognized, "the explanation offered by the IRS doesn't even meet *Maines* at all." ER-241:5–7.  In reality, *Maines* held that only the "*excess portion*" of a tax refund "that remains after first reducing state-tax liability … is an accession to the [taxpayer's] wealth, and [includible] in … federal gross income." 144 T.C. at 136 (emphasis added). *Maines* then repeated the point a second time, stating that "[i]t is only the potentially refundable excess credits that must be included in gross income." *Id.* And based on this principle, the court found that two of the credits it analyzed were nontaxable to the extent of taxes paid, while the third credit — which was limited to taxes paid — was fully nontaxable. *Id.* at 134–40.

The IRS has also argued that *Maines* "was describing the treatment of refundable state tax credits, not refunds." ER-179; ER-058. But that makes no sense, given that the IRS itself relied on *Maines* in Notice 2023-56 as authority for its tax refund determinations. ER-162–63. And regardless of whether a payment is labeled a credit, a refund, or a rebate, the material point is that it is nontaxable to the extent of taxes paid even if the payment exceeds taxes paid. *Maines*, 144 T.C. at 134 ("[T]he amount of a state-tax credit that *reduces*

52

a tax liability is not an accession to wealth under section 61[.]"); *see also Ginsburg v. United States*, 922 F.3d 1320, 1326 (Fed. Cir. 2019) ("[T]he *excess* amount of the state tax credit . . . paid to the [taxpayers] . . . is an economic gain . . . and is includable in gross income[.]"); *Rivera v. Comm'r*, 111 T.C.M. (CCH) 1156 (T.C. 2016) (same).

As the district court correctly observed, the IRS is therefore "arguing … a distinction without a difference." ER-256:3–9.

### 2. The IRS must make reasoned exclusion determinations.

Arizona alleges that the IRS subjected the State to discriminatory treatment based on the pretextual and arbitrary denial of the general welfare and disaster relief exclusions. *E.g.*, ER-282, 284, 286 ¶¶ 62, 69, 81. The IRS has responded with bare, contradictory assertions indicative of arbitrary decision-making and bereft of any legal argument supporting dismissal. *See* ER-060–63.

### (a) General welfare exclusion.

As the IRS has stated, to qualify for an exclusion from income under the general welfare exception, a "State payment[] must (1) be paid from a governmental fund, (2) be for the promotion of general welfare (that is,

53

based on the need of the individual or family receiving such payments), and (3) not represent compensation for services." ER-165 (Notice 2023-56).

It is undisputed that the Arizona Tax Rebate was paid from Arizona's general fund, and that it was not paid as compensation. As for the second prong, the IRS has argued that the Tax Rebate is taxable because it was available above the income limit that "is generally considered to be covered by the general welfare exclusion" and was limited to individuals with tax liability. ER-060–61. But tellingly, the IRS has never offered any authority for either purported criteria, and it failed to mention either purported criteria when it set out the requirements for the general welfare exception in Notice 2023-56. ER-165.

Nor can the IRS plausibly dispute that Notice 2023-56 and IR-2023-23—the guidance issued three months before Arizona enacted the Tax Rebate—both necessarily inform what "is generally considered to be covered." ER-160–75; ER-100–02. After all, the IRS has never identified any other specific guidance on when state tax refunds and payments qualify for an income exclusion, so those determinations provided the *only* benchmarks available to another state contemplating a tax refund in early 2023. *See, e.g.*, ER-281–82 ¶ 54 (Colorado: payments qualified for income exclusion with no

54

income cap and no dependents requirement); ER-282 ¶ 56 (California: payments qualified for income exclusion with $500,000 income cap and no dependents requirement).

Unable to defend its purported "criteria," the IRS simply asserts that "[n]o matter what the IRS determined for the 21 states," Arizona's Tax Rebate must "be evaluated on [its] own." ER-062. But if the Tax Rebate is "evaluated on [its] own," there is still no dispute that the general welfare exclusion has been applied to payments targeted at "food, medical care, housing, personal property, [and] transportation." ER-060 (motion to dismiss). Nor is there any dispute that Arizona explicitly enacted the Tax Rebate because "gas, groceries and other necessities [were] out of reach for many Arizonans" due to the inflationary crisis resulting from the COVID-19 pandemic. ER-045. Thus, even if the Tax Rebate is "evaluated on [its] own," the IRS's decision still contradicts its own legal position, raising questions about the determination's basis that cannot be resolved on the pleadings without the benefit of the administrative record.

But in any event, the Tax Rebate cannot properly be evaluated in isolation because it is unlawful—under the APA, the tax code, and equal sovereignty principles—for the IRS to make erratic decisions untethered

55

from its recent guidance. *See, e.g., F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (agency must provide a "reasoned explanation" for changing positions that displays awareness of doing so and "good reasons for the new policy"); *Est. of McLendon v. Comm'r*, 135 F.3d 1017, 1024 (5th Cir. 1998) (holding that the IRS cannot depart from its own guidance in a manner that "retroactively abrogate[s] a ruling in an unclear area" and finding reliance on revenue ruling appropriate); *Shelby Cnty.*, 570 U.S. at 544 ("the fundamental principle of equal sovereignty" precludes "disparate treatment of States" absent reasoned basis).

### (b)    Disaster relief exclusion.

The disaster relief exclusion is codified by statute, further constraining the IRS's discretion. Under the Code, payments from a "State … *in connection with* a qualified disaster in order to promote the general welfare" are not taxable as gross income. 26 U.S.C. § 139(b)(4) (emphasis added).

The COVID-19 pandemic was a qualified disaster for purposes of the disaster relief exclusion until its termination on May 11, 2023. *See* ER-166–67. Thus, payments made "in connection with" COVID-19 "in order to promote the general welfare" are not gross income under § 139(b)(4). Case law instructs that "in connection with" means "related to" or having a "logical

56

or causal connection." *Whistleblower 972-17W v. Comm'r*, No. 972-17W, 2022 WL 2718766, at *8, 10 (T.C. July 13, 2022) ("the phrase 'in connection with' establishes a standard that is 'quite broad'") (quoting *Azima v. RAK Inv. Auth.*, 926 F.3d 870, 878 (D.C. Cir. 2019)). And the IRS has clarified that such payments "are presumed to be made in order to promote the general welfare (that is, to be based on individual or family need) for all individuals affected by the disaster." ER-167.

The IRS was clearly cognizant of the applicable standard under § 139 when it issued its 2023 guidance. *See* ER-157 (exclusions available for rebates "*related*, directly or *indirectly, to the various consequences* of the [COVID-19] pandemic"); ER-100 (payments "related to the pandemic and *its associated consequences*" receive exclusions) (emphasis added). But as to Arizona, the IRS has offered only contradictory pretexts for its discrimination.

On the one hand, the IRS has repeatedly stated that "the particular label given to [a] payment made under State law is not controlling for Federal tax purposes." ER-162. But on the other hand, the IRS has recited a litany of "labels" that it faults Arizona for not including in the Tax Rebate law. The IRS now purports to fault the Arizona Legislature for, among other things, not referencing (i) "the COVID-19 pandemic or … the federally

57

declared disaster"; (ii) "the IRS's statement on the 2022 payments"; (iii) whether "Arizona modeled its program after any of the 21 states that received ... desired tax treatment"; or (iv) "that Arizona expect[ed] the[] [Rebate] to be excluded from federal income tax based on the general welfare or disaster relief exclusions." ER-061.

Although nothing in § 139 requires state laws to recite "the federally declared disaster"—or any other magic language—Arizona's Legislature did, of course, identify the Tax Rebate as a "general welfare rebate" and specifically find that "[i]nflation is at a forty-year high, putting gas, groceries and other necessities out of reach for many Arizonans." ER-146, 149; *compare with* ER-122 (Delaware: "This relief was intended to promote the general welfare of Delawareans emerging from the COVID-19 pandemic and facing higher prices at the grocery store and gas pump."). Yet while Delaware received an income exclusion, the IRS declined to credit Arizona's legislative finding on the purported basis that "[i]nflation is a broader macroeconomic phenomenon, and many factors contributed to the elevated inflation rate." ER-191.

Whatever weight post hoc rationales of this sort might warrant, they are not pleadings arguments.

58

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's dismissal of Arizona's complaint.

Respectfully submitted this 4th day of April, 2025.

> KRISTIN K. MAYES
>   ARIZONA ATTORNEY GENERAL
>
> By */s/ Clinten N. Garrett*
> Joshua D. Bendor
> Alexander W. Samuels
> Clinten N. Garrett
> Kathryn E. Boughton
> OFFICE OF THE ARIZONA
>   ATTORNEY GENERAL
> 2005 N. Central Ave.
> Phoenix, AZ 85004
> (602) 542-3333
> Joshua.Bendor@azag.gov
> Alexander.Samuels@azag.gov
> Clinten.Garrett@azag.gov
> Kathryn.Boughton@azag.gov
> ACL@azag.gov
>
> *Counsel for State of Arizona*

59

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Circuit Rule 32-1(a) because it contains 12,107 words according to the word-processing system used to prepare the brief.

2. This brief complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in fourteen-point Book Antiqua type style.

Dated this 4th day of April, 2025.

By /s/ Mary Blas

## CERTIFICATE OF SERVICE

I certify that I presented the above and foregoing for filing and uploading to the ACMS system which will send electronic notification of such filing to all counsel of record.

Dated this 4th day of April, 2025.

*/s/ Mary Blas*