# No. 25-273

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

————————————

### STATE OF ARIZONA,

**Plaintiff-Appellant**

v.

### UNITED STATES INTERNAL REVENUE SERVICE; UNITED STATES DEPARTMENT OF THE TREASURY; UNITED STATES OF AMERICA; SCOTT BESSENT, in his official capacity as Secretary of the Treasury; MICHAEL FAULKENDER, in his official capacity as Acting Commissioner of Internal Revenue,

**Defendants-Appellees**

————————————

### ON APPEAL FROM THE JUDGMENT OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA

————————————

### BRIEF FOR THE APPELLEES

————————————


CLINT A. CARPENTER          (202) 514-4346
ANTHONY T. SHEEHAN          (202) 514-4339
  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

*Of Counsel:*
TIMOTHY COURCHAINE
  *United States Attorney*

-i-

# TABLE OF CONTENTS

**Page**

Table of contents .............................................................................i

Table of authorities ......................................................................iv

Glossary .........................................................................................ix

Statement of jurisdiction............................................................. 1

Statement of the issues ................................................................ 1

Applicable statutes and regulations ........................................... 2

Statement of the case ................................................................... 2

        A.    Course of proceedings and disposition below ................ 2

        B.    The IRS's prudential decision not to challenge the taxability of special pandemic-related payments that many taxpayers received from their states in 2022 ............................................................................ 4

        C.    Arizona's post-pandemic 2023 payment program ......... 7

        D.    The IRS's guidance regarding the tax consequences of state payments made after 2022......... 9

        E.    The IRS's stated view that payments under Arizona's 2023 program were income to the recipients ................................................................... 11

        F.    Arizona's complaint and the District Court's dismissal............................................................... 12

Summary of argument ........................................................ 15

Argument.............................................................................. 20

    I.    The District Court correctly dismissed for lack of Article III standing because Arizona's complaint failed to state a legally cognizable injury ...................................... 20

        Standard of review .............................................................. 20

-ii-

**Page**

A.    Arizona has standing, if at all, to seek the redress
      of injuries to itself, not to its residents .........................21

B.    Arizona's alleged loss of sales tax revenue does not
      give it standing via financial injury ............................25

      1.    States cannot claim standing based on
            incidental or indirect effects of federal policy
            on state revenues and spending .........................25

      2.    The allegations in Arizona's complaint are
            insufficient to establish standing .......................27

      3.    The two later declarations do not overcome
            the deficiencies in Arizona's complaint .............31

      4.    Arizona's arguments are based on a standard
            that is contrary to law..........................................32

C.    Arizona's alleged differential treatment does not
      give it standing via sovereign injury ...........................34

      1.    Arizona's situation is not comparable to that
            of the states that made payments in 2022 .........34

            a.    The circumstances of IR-2023-23 .............35

            b.    The 17 states whose payments were not
                  challenged under the general welfare
                  and disaster relief exclusions ....................36

            c.    The four states whose payments were
                  tax refunds .................................................42

      2.    Arizona's situation is not comparable to that
            of South Carolina in *Regan*...................................43

-iii-

**Page**

II.   Dismissal of Arizona's complaint was also warranted on the United States' theories that the District Court did not reach ................................................................... 46

Standard of review ............................................................... 46

A.   The District Court lacked subject-matter jurisdiction because the United States has not waived its sovereign immunity from Arizona's claims ................................................................... 47

1.   Most of the provisions that Arizona invoked do not waive sovereign immunity ...................... 48

2.   Arizona's claims fall outside the waiver of sovereign immunity provided by the Administrative Procedure Act ........................... 49

3.   The AIA and DJA bar Arizona's complaint. ....... 52

B.   The dismissal of this action can also properly be affirmed based on Arizona's failure to state a claim on which relief can be granted .................................... 58

1.   Arizona failed to state a claim under the APA because the IRS's administrative position is not arbitrary and capricious ............................... 58

2.   The payments Arizona made in 2023 are includable in the recipients' income ................... 59

a.   Arizona's payments are not nontaxable refunds of state taxes paid ........................ 59

b.   Arizona's payments do not qualify for the general welfare exclusion ................... 62

-iv-

**Page(s)**

c.    Arizona's payments do not qualify as disaster relief payments ............................ 65

Conclusion ................................................................ 67
Statement of related cases .................................... 68
Certificate of compliance ...................................... 69

## TABLE OF AUTHORITIES

**Cases:**

*Adams v. Johnson*, 355 F.3d 1179 (9th Cir. 2004) ........................... 24
*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592 (1982) ............................................. 23
*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787 (2015) ......................... 23
*Arizona v. Biden*, 40 F.4th 375 (6th Cir. 2022) ................................. 26
*Arizona v. Yellen*, 34 F.4th 841 (9th Cir. 2022) ............................... 44
*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................ 20, 27
*Bailey v. Commissioner*, 88 T.C. 1293 (1987) ................................ 63
*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................ 27
*Bennett v. Spear*, 520 U.S. 154 (1997) .......................................... 50
*Bob Jones Univ. v. Simon*, 416 U.S. 725 (1974) ........................ 52-53
*Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426 (1955) ...................................................... 4
*Confederated Tribes & Bands of Yakama Indian Nation v. Alcohol & Tobacco Tax & Trade Bureau*, 843 F.3d 810 (9th Cir. 2016) .............................. 53-56
*Confederated Tribes & Bands of Yakama Nation v. Yakima Cnty.*, 963 F.3d 982 (9th Cir. 2020) ..................... 54
*Dugan v. Rank*, 372 U.S. 609 (1963) .............................................. 1
*Dunn & Black, P.S. v. United States*, 492 F.3d 1084 (9th Cir. 2007) ..................................... 48
*El Paso Cnty. v. Trump*, 982 F.3d 332 (5th Cir. 2020) ..................... 27

-v-

**Cases (cont'd):**                                          **Page(s)**

*Elias v. Connett*, 908 F.2d 521 (9th Cir. 1990) ........................53, 57-58

*Enochs v. Williams Packing & Navigation Co.*,
    370 U.S. 1 (1962) .................................................................53, 57

*Fairbanks N. Star Borough v. U.S. Army Corps of*
    *Engineers*, 543 F.3d 586 (9th Cir. 2008) .................................50-51

*Flora v. United States*, 362 U.S. 145 (1960) ...............................49

*Florida v. Mellon*, 273 U.S. 12 (1927)...................................25, 45, 62

*Gallo Cattle Co. v. U.S. Dep't of Agric.*,
    159 F.3d 1194 (9th Cir. 1998) ...........................................50

*Gilbert v. United States*, 998 F.3d 410 (9th Cir. 2021).....................52

*Ginsburg v. United States*,
    922 F.3d 1320 (Fed. Cir. 2019)...........................................60

*Hawaii v. Gordon*, 373 U.S. 57 (1963) ....................................1

*Hollingsworth v. Perry*, 570 U.S. 693 (2013) ...............................28

*Hughes v. United States*, 953 F.2d 531 (9th Cir. 1992)....................48

*Interpipe Contracting, Inc. v. Becerra*,
    898 F.3d 879 (9th Cir. 2018) ...........................................58

*Ipsen Biopharmaceuticals, Inc. v. Azar*,
    943 F.3d 953 (D.C. Cir. 2019)...........................................51

*J&G Sales Ltd. v. Truscott*,
    473 F.3d 1043 (9th Cir. 2007) ...........................................59

*Jones v. L.A. Cent. Plaza LLC*,
    74 F.4th 1053 (9th Cir. 2023) ..........................................20, 22,
                                  27, 46

*Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001)..............3, 40

*Leite v. Crane Co.*, 749 F.3d 1117 (9th Cir. 2014) ......................20, 27

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ....................20, 22, 27

*Maines v. Commissioner*, 144 T.C. 123 (2015) ......................43, 60-63

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ...............................23

*Massachusetts v. Mellon*, 262 U.S. 447 (1923) .....................23-24, 27,
                                  44-46, 55

*McMaster v. Coca-Cola Bottling Co. of Cal.*,
    392 F. Supp. 2d 1107 (N.D. Cal. 2005)........................................48

-vi-

**Cases(cont'd):**                                                    **Page(s)**

*N. Cascades Conservation Council v. U.S. Forest Serv.*,
　　136 F.4th 816 (9th Cir. 2025) ..................................................58-59

*Navajo Nation v. Dep't of the Interior*,
　　876 F.3d 1144 (9th Cir. 2017) .............................................50

*Nevada v. Burford*, 918 F.2d 854 (9th Cir. 1990)...........................23

*New York v. Yellen*, 15 F.4th 569 (2d Cir. 2021) ........................33-34,
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　56-57

*Pennsylvania v. Kleppe*, 533 F.2d 668 (D.C. Cir. 1976) .............25-26

*Pennsylvania v. New Jersey*, 426 U.S. 660 (1976)...........................46

*Perlowin v. Sassi*, 711 F. 2d 910 (9th Cir. 1983) ...........................52

*Planned Parenthood v. U.S. Dep't of Health & Hum.*
　　*Servs.*, 946 F.3d 1100 (9th Cir. 2020)...........................................47

*Sierra Club v. Trump*, 977 F.3d 853 (9th Cir. 2020),
　　*vacated due to changed circumstances sub nom.*
　　*Biden v. Sierra Club*, 142 S. Ct. 56 (2021) ...........................26-27

*Silver Lake Grp., LLC Sec. Litig., In re*,
　　108 F.4th 1178 (9th Cir. 2024)...........................................21, 46

*South Carolina v. Regan*, 465 U.S. 367 (1984)...................14, 43-44,
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　53-56

*United States v. Miller*, 145 S. Ct. 839 (2025)................................47

*United States v. Ritchie*, 342 F.3d 903 (9th Cir. 2003) ...................21

*United States v. Texas*, 599 U.S. 670 (2023)...................................25

*Washington v. FDA*, 108 F.4th 1163 (9th Cir. 2024)............20, 22-25,
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　30, 32-34

*Wyoming v. Oklahoma*, 502 U.S. 437 (1992)........................25-26, 33

*XY Planning Network, LLC v. SEC*,
　　963 F.3d 244 (2d Cir. 2020).................................................25-26

-vii-

**Constitution & Statutes:**                                    **Page(s)**

Constitution of the United States:
    Article I ...................................................................... 13, 48
    Article III ................................................... 1, 20, 22, 33
    Sixteenth Amendment ....................................... 13, 48

5 U.S.C. (Government Organization and Employees):
    Administrative Procedure Act (in general)...... 18-19, 49-50, 52, 58
    § 701.................................................................................49
    § 702.................................................................................49
    § 704.................................................................................50
    § 706.................................................................................58

26 U.S.C. (Internal Revenue Code of 1986):
    § 61....................................................... 4, 13, 48, 61
    § 139...................................................4-5, 42, 65
    § 165............................................................ 4, 65
    § 6212...............................................................................49
    § 6213...............................................................................49
    § 6511...............................................................................49
    § 6532...............................................................................49
    § 7421 (Anti-Injunction Act)............... 13, 18, 22, 49, 52-53, 55, 57
    §§ 7421–7437 ...............................................................48
    § 7422...............................................................................49

28 U.S.C. (Judiciary and Judicial Procedure):
    § 1291.................................................................................1
    § 1331............................................................................ 1, 48
    § 1340............................................................................ 1, 48
    § 1346...............................................................................49
    § 1491...............................................................................49
    § 2201 (Declaratory Judgment Act) .......... 13, 19, 22, 49, 52-53, 57
    § 2701.................................................................................1

Robert T. Stafford Disaster Relief and Emergency
    Assistance Act, 42 U.S.C. §§ 5121–5207............................ 4, 35, 65

-viii-

**Miscellaneous:**                   **Page(s)**

9th Circuit Rule 28-2.7 ............................................................ 2

Federal Rule of Appellate Procedure 28 ............................................. 2

Federal Rule of Civil Procedure 12 ................................... 13-14, 27, 58

Federal Rule of Evidence 201 ......................................................... 3, 40

Internal Revenue Service Releases:
    GCM 36470 (1975), 1975 WL 37487 .............................................. 63
    IR-2023-23 .................................................. 5, 11, 35, 37-38, 40-42
    IR-2023-158 .................................................................... 9, 38
    Notice 2002-76, 2002-2 C.B. 917 ................................................ 42
    Notice 2023-56 ....................................... 5, 9, 38, 41-42, 45, 60, 63
    Rev. Rul. 2005-46, 2005-2 C.B 120 .............................................. 63
    Tax credits for individuals: What they mean
        and how they can help refunds
        [https://perma.cc/YD6S-XCAG] .............................................. 60

-ix-

# GLOSSARY

| | |
|---|---|
| AIA | Anti-Injunction Act (I.R.C. § 7421(a)) |
| APA | Administrative Procedure Act (citing provisions regarding judicial review (5 U.S.C. §§ 701–706)) |
| DJA | Declaratory Judgment Act (28 U.S.C. § 2201(a)) |
| ER | Excerpts of Record (cited as instructed in this Court's Rules) |
| I.R.C. | Internal Revenue Code of 1986 (26 U.S.C.), as amended |
| IRS | Internal Revenue Service |

-1-

## STATEMENT OF JURISDICTION

On February 21, 2024, Arizona filed this suit against the United States in the United States District Court for the District of Arizona, invoking jurisdiction under 28 U.S.C. §§ 1331 and 1340.[1]  (ER-275; ER-291-92.)  The District Court dismissed for lack of jurisdiction due to the absence of an injury sufficient to confer standing.  (ER-5-12.)

On November 15, 2024, the District Court entered a final judgment dismissing this case.  (ER-4.)  On January 10, 2025, Arizona filed a timely notice of appeal.  (ER-293-94.)  28 U.S.C. § 2701(b).  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.  Whether the District Court correctly held that Arizona lacked Article III standing to sue because its complaint failed to state a legally cognizable injury to the state.

---

[1] Arizona sued the United States and its agencies and officers in their official capacities seeking relief that would require official action and operate against the United States and its fisc.  (ER-276; ER-291.)  Accordingly, this is a suit against the United States and subject to all the limitations pertaining thereto.  *Hawaii v. Gordon*, 373 U.S. 57, 58 (1963); *Dugan v. Rank*, 372 U.S. 609, 620 (1963).

-2-

2. Whether dismissal of Arizona's complaint was warranted, in the alternative, for lack of subject-matter jurisdiction or failure to state a claim on which relief could be granted.

## APPLICABLE STATUTES AND REGULATIONS

The provisions relevant to this appeal are set forth in the body of this brief. *See* Fed. R. App. P. 28(f); 9th Cir. R. 28-2.7.

## STATEMENT OF THE CASE

### A.    Course of proceedings and disposition below

In 2023, Arizona issued to certain Arizona taxpayers one-time payments that the IRS considers to be income for federal income-tax purposes. (ER-274; ER-282.) Arizona sued for a declaration that the payments are not federally taxable, an injunction against taxing them, and refunds to Arizona taxpayers of federal tax collected on the payments. (ER-273-92.) Although Arizona referred to documents in its complaint, there were no attachments. Arizona moved for a preliminary injunction, attaching two supporting declarations and many of the documents referenced in the complaint. (ER-95-195.) The District Court denied the injunction. (ER-224-31.)

The United States then moved to dismiss Arizona's complaint for lack of jurisdiction and failure to state a claim. (ER-39.) Arizona

-3-

opposed the motion, attaching a supplemental declaration.  (ER-64-94; ER-196-200.)  The District Court granted the Government's motion and dismissed for lack of jurisdiction because Arizona's complaint on its face failed to allege an injury sufficient to confer standing.  (ER-4-12.) Arizona appealed.  (ER-293-94.)

Because the District Court held that jurisdiction was lacking on the face of the complaint, this brief treats as true the non-conclusory allegations in Arizona's complaint (ER-273-92) and in the 15 exhibits supporting its injunction motion (ER-95-191).  *See* pp. 20-21, *infra* (discussing review of "facial" challenges to jurisdiction).  Those exhibits were referenced in the complaint, are legal authorities, or are proper subjects of judicial notice.  *See* Fed. R. Evid. 201(b); *Lee v. City of Los Angeles*, 250 F.3d 668, 688-90 (9th Cir. 2001).  We set aside for now the affidavits supporting the United States' opposition to Arizona's injunction motion (ER-297 (Doc. 24)), and we reserve the right later to challenge Arizona's allegations.

-4-

### B.    The IRS's prudential decision not to challenge the taxability of special pandemic-related payments that many taxpayers received from their states in 2022

In March 2020, the President declared that the COVID-19 pandemic was a national emergency of sufficient severity to warrant an emergency declaration under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §§ 5121–5207, making it a "federally declared disaster" under §§ 139(c)(2) and 165(i)(5)(A) of the Internal Revenue Code ("I.R.C."), 26 U.S.C.  (ER-166-67.)  During the heart of that emergency, 21 states enacted programs to give special payments to their residents in 2022.  (ER-100; ER-276.)  Arizona was not among those states.  (ER-100-01.)

The particulars of the 2022 state-payment programs varied from state to state, but the existence of the payments raised a thorny federal tax question: Were the taxpayers who received the payments required to report them as income on their 2022 federal income tax returns?  In general, federal tax law treats payments from a state as income to the recipient, just like any other payment.  *See* I.R.C. § 61(a) (defining "gross income" as all income from whatever source derived, unless excluded by law); *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426,

-5-

431 (1955) (recognizing that taxable income includes any undeniable accession to wealth, clearly realized, over which the taxpayer has complete dominion).  Potentially relevant to the 2022 state-payment programs, however, were three types of state payments that are generally excludable from income: qualified disaster relief payments under I.R.C. § 139(a), qualified "general welfare" payments, and refunds of state taxes paid.  *See generally* Notice 2023-56 (ER-162-67) (explaining the rules governing these three exclusions from income).

With the April 2023 deadline for filing 2022 tax returns fast approaching, the Secretary of Health and Human Services gave notice on February 9, 2023, that the COVID-19 emergency would expire on May 11, 2023.  (ER-153-55.)  Armed with that information, the IRS on February 10, 2023, issued a news release, IR-2023-23 (ER-100-02), "clarifying the federal tax status involving special payments made by 21 states in 2022" and expressing appreciation for the patience of the tax community "as the IRS and Treasury worked to resolve this unique and complex situation."  (ER-100.)  "To assist taxpayers who have received these payments [to] file their returns in a timely fashion," the news release advised that, although state payments are generally includable

-6-

in income, the IRS had decided, "in the interest of sound tax administration and other factors," that "taxpayers in many states will not need to report these payments on their 2022 tax returns." (ER-100.)

For taxpayers in four of the 21 states, the IRS had determined that those states' payments constituted refunds of state taxes paid. (ER-101.) Therefore, the payments in 2022 from those four states would be excluded from the recipients' income for federal tax purposes, unless the recipient had received a federal tax benefit by deducting the state taxes on a prior year's return. (ER-100-01; *see also* ER-162-64.)

For taxpayers in the other 17 states, the IRS had decided only that it "will not challenge the taxability" of those states' 2022 payments, which the IRS recognized were "related to general welfare and disaster relief." (ER-100-01.) The IRS explained that "[i]f a payment is made for the promotion of the general welfare or as a disaster relief payment, for example related to the outgoing pandemic, it *may* be excludable from income for federal tax purposes under the General Welfare Doctrine or as a Qualified Disaster Relief Payment." (ER-101 (emphasis added).) But determining whether a payment qualified for those exceptions was "a complex fact intensive inquiry that depends on a number of

-7-

considerations." (ER-101; *see also* ER-164-67.) And nowhere did the news release indicate that the IRS had made that determination for any of the 17 states' payments. (ER-100-01.)

Rather, the IRS had decided that "if a taxpayer does not include the amount of one of these payments in its 2022 income for federal income tax purposes, the IRS will not challenge the treatment of the 2022 payment as excludable." (ER-101.) This forbearance, the IRS had determined, was "in the best interest of sound tax administration" for two prudential reasons. (ER-101.) The first was "the complicated fact-specific nature of determining the treatment of these payments for federal tax purposes balanced against the need to provide certainty and clarity for individuals who are now attempting to file their federal income tax returns." (ER-101.) And the second reason was "the fact that the pandemic emergency declaration is ending in May, 2023 making this an issue only for the 2022 tax year." (ER-101.)

### C.    Arizona's post-pandemic 2023 payment program

On May 11, 2023, the COVID-19 public health emergency expired. (ER-153.) That same day, Arizona enacted what it called the "Arizona families tax rebate," which granted Arizona taxpayers "a onetime

-8-

individual income tax general welfare rebate," to be paid several months later, if they met certain requirements.  (ER-97; ER-146-49.) Although Arizona has alleged that it enacted this payment program in reliance on the IRS's above-described guidance concerning the 2022 payments issued by 21 states (ER-278), the legislation did not mention the IRS's guidance or COVID.  It instead found: "Inflation is at a forty-year high, putting gas, groceries and other necessities out of reach for many Arizonans. … Responsible budgeting has allowed this state to take action to mitigate the harmful impacts of inflation by returning a portion of the surplus to this state's taxpayers with dependents." (ER-149; ER-278; ER-288.)

Arizona taxpayers qualified for a one-time payment under this post-pandemic program if they: (i) had paid 2019, 2020, or 2021 Arizona income tax; (ii) had income below the threshold that would bar the dependent tax credit; and (iii) had claimed that credit for 2021 on a full-year resident tax return.  (ER-146-47; ER-181; ER-274; ER-278-79.) The payment amount was $250 for each dependent under 17 and $100 for each dependent 17 or older, capped at $750 per taxpayer.  (ER-147; ER-278.)  The payments were not capped at the amount of Arizona tax

-9-

previously paid, but the state has alleged that most recipients had an

Arizona tax liability greater than their payment amount and had not

deducted that liability from federal income.  (ER-284.)

The payments were to be made from October 15 through

November 15, 2023, out of Arizona's general fund and were not paid as

compensation for services.  (ER-148; ER-278.)  The legislation provided

for state tax purposes that in computing Arizona adjusted gross income,

any payment received under the program that was "required to be

included in Arizona gross income under the internal revenue code shall

be subtracted from the taxpayer's Arizona gross income."  (ER-148.)

## D. The IRS's guidance regarding the tax consequences of state payments made after 2022

On August 30, 2023, the IRS issued Notice 2023-56 (ER-160-75) in

response to "requests for guidance regarding the Federal income tax

consequences of State payments made in 2023 and future years."

(ER-161.)  An accompanying news release, IR-2023-158 (ER-157-58),

explained that the guidance in Notice 2023-56 was intended "to provide

additional certainty to states and their residents regarding the federal

income tax consequences of state payments made to taxpayers"

(ER-157).  This guidance explained in detail "the rules that the [IRS]

-10-

applies in determining the Federal income tax consequences of refunds of State or local taxes and certain other payments made by State or local governments … to individuals." (ER-160.)  In particular, the guidance described the rules governing the exclusions from income for state-tax refunds, "general welfare" payments, and "disaster relief" payments.  (ER-161-67, ER-169-74.)

This August 2023 guidance also distinguished the IRS's February 2023 guidance regarding the 2022 payments from 21 states, noting that many of the 2022 payment programs "were related, directly or indirectly, to the various consequences of the [COVID-19] pandemic, and the programs varied in terms of the types of payments, payment amounts, and eligibility criteria." (ER-157; ER-160.)  The IRS emphasized that the February 2023 guidance "only described the taxability of payments made during 2022" (ER-157), was issued "to provide certainty for the 2023 Federal income tax filing season," and "applied only for payments made in 2022" (ER-160-61).[2]

---

[2] The IRS also stated, however, that its forbearance with respect to the 2022 payments would extend to "spillover" payments authorized under the 2022 programs but received early in 2023.  (ER-158.)

-11-

### E.    The IRS's stated view that payments under Arizona's 2023 program were income to the recipients

Arizona alleges that in a December 2023 video meeting, the IRS orally advised the Arizona Department of Revenue that Arizona's payments were "federally taxable in full." (ER-282.) In January 2024, the Arizona Attorney General wrote a letter to the IRS expressing "concern" about the IRS's position. (ER-177.) The IRS responded with a February 15, 2024 letter confirming its view that the payments under Arizona's 2023 program "constitute income to the recipients for federal income tax purposes." (ER-177-79; ER-282.)

Regarding the IRS's guidance about the payments made by other states in 2022, the letter stated:

> Last February, we provided broad administrative relief for state payments made in 2022 because it was the middle of filing season and numerous states had adopted a variety of payment programs requiring a fact-intensive analysis to determine whether they qualified for an exclusion. We provided this administrative relief on an expedited basis in order to provide taxpayers the certainty they needed to be able to file their returns without undue delay. This did not reflect a legal determination as to the proper treatment for each of the payments. The announcement made clear that this administrative relief applied only for payments made in 2022.

(ER-177 (citing IR-2023-23, Feb. 10, 2023).)

-12-

The IRS's letter then went on to explain that the Arizona payments did not qualify for the general welfare exclusion because the payment criteria excluded the poorest residents while allowing payments to high-income residents.  (ER-178.)  It further stated that the payments did not qualify as refunds of state taxes paid because Arizona had not capped the payments at the amount of prior state tax paid.  (ER-178-79.)  And in a similar letter to Arizona Senate President Warren Petersen (ER-189-91), the IRS added that the Arizona payments did not qualify for the disaster relief exclusion because the enacting legislation: (i) cited inflation (a broad macroeconomic phenomenon) and returning a portion of Arizona's budget surplus as the reasons for the payments, without mentioning COVID; and (ii) excluded Arizona's poorest families by requiring that recipients have paid at least $1 of Arizona tax (ER-190-91).

## F.    Arizona's complaint and the District Court's dismissal

Arizona alleged in its complaint that it had been injured by the loss of an estimated $480,000 in "transaction privilege taxes" (Arizona's version of sales tax) and by its 2023 payments being treated differently than the 2022 payments of the other states.  (ER-273-87.)  It made five

-13-

claims: (i) violation of I.R.C. § 61 by not treating Arizona's payments as

qualifying for the exclusions for general welfare or disaster relief;

(ii) violation of I.R.C. § 61 by not treating the payments as state tax

refunds; (iii) violation of Article I and the Sixteenth Amendment by not

treating the payments as state tax refunds; (iv) disparate treatment in

violation of Arizona's equal state sovereignty; and (v) the making of an

arbitrary and capricious determination that the IRS did not properly

promulgate.  (ER-287-91.)  Arizona sought a declaration that the IRS's

position is unlawful, an injunction prohibiting the IRS from enforcing

its position, and refunds to its taxpayers of federal taxes collected on the

Arizona payments.[3]  (ER-291.)

The United States moved under Federal Rule of Civil Procedure

12(b)(1) to dismiss for lack of jurisdiction due to lack of standing, lack of

a waiver of sovereign immunity, and running afoul of the Anti-

Injunction Act (I.R.C. § 7421(a)) and the tax exception to the

Declaratory Judgment Act (28 U.S.C. § 2201(a)).  (ER-39.)  The United

---

[3] Arizona later acknowledged that it cannot obtain refunds for its
taxpayers.  (ER-21; ER-31; ER-85; Br. 48.)

-14-

States also sought dismissal under Rule 12(b)(6) for failure to state a claim.  (ER-39.)

The District Court dismissed for lack of jurisdiction because the complaint on its face failed to allege an injury sufficient to confer standing.  (ER-4-12.)  The complaint did not show a direct injury in the form of a loss of specific tax revenues but instead had alleged a general loss that was derivative and speculative.  (ER-8-9.)  Regarding disparate treatment, the court noted that the effects of COVID were different in 2022 than in 2023 and that Arizona had not identified any other state payments that the IRS had treated differently in 2023.  (ER-10-11.)  Arizona also could not rely on *South Carolina v. Regan*, 465 U.S. 367 (1984), because the IRS's advice did not compel Arizona to act, restrict its actions, or force it to pay more to its residents.  (ER-11-12.)

-15-

## SUMMARY OF ARGUMENT

In 2023, Arizona made payments to its residents. The IRS has advised Arizona that it considers those payments to be federally taxable income to the recipients. Arizona sued for a declaration that its payments are not taxable and an injunction preventing the IRS from taxing them. The District Court correctly dismissed Arizona's complaint for lack of jurisdiction because Arizona cannot state a legally cognizable injury and therefore lacks standing to sue.

1. Arizona has no standing to insert itself into a prospective dispute between the IRS and the taxpayers who received payments from Arizona. Because states have standing to sue the United States only to vindicate their own interests, Arizona must show an injury to itself that would be remedied by its requested relief.

a. Arizona's alleged loss of sales-tax revenue does not give it standing via financial injury. Because federal policy necessarily affects the states differently, the incidental or indirect fiscal effects thereof do not give standing. A state must show a direct injury from the loss of specific tax revenues, or at least a concrete impact on revenue linked to an allegedly unlawful action by a strong causal chain. In its complaint,

-16-

Arizona made the conclusory allegation that the federal tax on its payments cost it $480,000 in sales tax revenue that its residents otherwise would have paid. Without well-pleaded predicate facts, that allegation is insufficient even for a facial analysis. And even if that allegation were accepted as true, the claimed injury would not confer standing because it is speculative and derivative of alleged harm to Arizona taxpayers. They are free to use their money as they see fit, and not necessarily on items subject to Arizona sales tax.

b. Arizona's alleged differential treatment does not give it standing via sovereign injury. In 2022, during the height of the declared federal emergency for the COVID-19 pandemic, 21 states made payments to their residents. During the filing season for 2022 returns, the IRS issued a news release announcing—for purposes of sound tax administration and to facilitate the timely filing of those returns—that it would not challenge the exclusion of those payments from the 2022 returns. For 17 states, the IRS decided not to challenge the payments under the exclusions for general welfare or disaster relief. The language employed in the release indicated that the IRS was not making a legal determination but instead granting a one-time

-17-

forbearance for payments made during an emergency that would soon end. The remaining four states had capped their payments at the amount of state taxes previously paid, allowing the payments to be treated as state-tax refunds, which are generally not taxable.

The circumstances surrounding Arizona's payments were materially different. It enacted its legislation in 2023 on the last day of the pandemic emergency, with the payments to be made months later and reported by the recipients on 2023 returns to be filed in 2024. The IRS, in the ordinary course of business, was able to evaluate Arizona's program on its merits and to decide that the payments were taxable.

Arizona does not and cannot argue that payments under its program would not have received the same forbearance as those of the 17 states had Arizona enacted its program and made its payments in 2022. Nor is there any indication whether the payments under any of the 17 states' 2022 programs would have been treated as excludable from income had they been issued in 2023. And because Arizona's payments were not capped, they did not qualify as tax refunds. It is hard to imagine a more reasoned basis for the IRS's decisions than a pandemic in 2022 that had abated by 2023.

-18-

c. Arizona also compares its situation to cases in which federal legislation had directly impacted how a state could exercise a sovereign power. Here, however, nothing the IRS did compelled or restrained Arizona's actions. Arizona can grant whatever payments it wants to its residents, but it has no standing to dictate the federal tax consequences of receiving such payments.

2. Arizona argues that the United States cannot prevail on its other theories not reached by the District Court. The question is moot because Arizona lacks standing regardless. But in any event, Arizona is mistaken: the District Court lacked jurisdiction, and Arizona failed to state a claim on the merits, even if Arizona has standing to sue.

a. The only waiver of sovereign immunity potentially applicable here is the Administrative Procedure Act. It requires a final agency action for which there is no other adequate remedy and forbids suits barred by other statutes. The IRS's advice that Arizona's payments are includable in federal income is not a final agency action. It does not determine Arizona's legal rights and obligations, impose legal consequences on Arizona, or give Arizona an occasion for compliance or defiance. Arizona's suit is also barred by the Anti-Injunction Act and

-19-

the tax exception to the Declaratory Judgment Act that, respectively, bar suits like this one for tax injunctions and declarations.

Arizona argues that it comes within the judicial exception to those Acts created by the Supreme Court for claims that otherwise would escape review. This Court, however, reads that exception narrowly to cover claims that cannot be reviewed at all. Arizona's interests are inextricably intertwined with those of its taxpayers who can challenge the IRS with the same arguments that Arizona is raising. Arizona also does not qualify for a different judicial exception because it is not certain to win on the merits.

b. Arizona also failed to state a claim on which relief can be granted. The IRS's position is neither arbitrary nor capricious as required for relief under the APA. Arizona's uncapped payments are not tax refunds. They are not targeted at the specific needs of low-income residents to qualify for the general welfare exclusion. And their purpose of ameliorating the effects of inflation was not sufficiently connected to the pandemic to qualify for the disaster relief exclusion.

The District Court's dismissal should be affirmed.

-20-

## ARGUMENT

## I

### The District Court correctly dismissed for lack of Article III standing because Arizona's complaint failed to state a legally cognizable injury

### Standard of review

This Court reviews *de novo* dismissals for lack of standing. *Washington v. FDA*, 108 F.4th 1163, 1171-72 (9th Cir. 2024); *Jones v. L.A. Cent. Plaza LLC*, 74 F.4th 1053, 1057 (9th Cir. 2023).

Each jurisdictional requirement must be supported with the manner and degree of evidence required at that stage of the litigation. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Leite v. Crane Co.*, 749 F.3d 1117, 1121-22 (9th Cir. 2014). Because this case involves a "facial" challenge to jurisdiction (ER-8), the standard is the same as for a dismissal for failure to state a claim. *Jones*, 74 F.4th at 1056-57 & n.1; *Leite*, 749 F.3d at 1121. The court accepts the complaint's non-conclusory allegations as true, draws all reasonable inferences in their favor, and determines whether they are legally sufficient to invoke jurisdiction or to state a claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-81 (2009); *Washington*, 108 F.4th at 1174; *Jones*, 74 F.4th at 1056-57; *Leite*, 749 F.3d at 1121. Matters of judicial notice, documents attached

-21-

to the complaint, and documents incorporated by extensive reference or reliance are treated as part of the complaint. *In re Silver Lake Grp., LLC Sec. Litig.*, 108 F.4th 1178, 1186 n.5 (9th Cir. 2024); *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

### A. Arizona has standing, if at all, to seek the redress of injuries to itself, not to its residents

Arizona lacks standing to insert itself into a prospective dispute between the IRS and the taxpayers who received payments from Arizona. Although Arizona contends that the IRS "grant[ed] income exclusions to 17 states but not to Arizona" (Br. 19), that is not so. The IRS did not (nor does it ever) grant income exclusions to any state. Rather, it issued guidance *to taxpayers* about the federal tax consequences *to taxpayers* of payments they might have received from a state. Any benefit or harm that accrues to a state as a result of those federal tax consequences is purely incidental.

To the extent that taxpayers who received Arizona's 2023 payments disagree with the IRS's view that the payments had to be included in their income for federal tax purposes, they are free to pursue any of the multiple avenues to administrative and judicial relief that federal law makes available to taxpayers. Arizona improperly

-22-

seeks not only to insert itself into that process, but also to obtain declaratory and injunctive relief that the Anti-Injunction Act, I.R.C. § 7421(a), and the Declaratory Judgment Act, 28 U.S.C. § 2201(a), expressly deny to taxpayers.

Because Article III of the Constitution limits the judicial power to deciding cases or controversies, every plaintiff must show: (1) an injury in fact, *viz.*, an invasion of a legally protected interest that is concrete, particularized, and actual or imminent (not conjectural or hypothetical); (2) a causal connection allowing the injury to be fairly traceable to the defendant's conduct; and (3) a likelihood that a favorable decision will redress the injury. *Lujan*, 504 U.S. at 559-61; *Washington*, 108 F.4th at 1172; *Jones*, 74 F.4th at 1057.

States have standing to sue the United States only to vindicate their own interests, consisting of: (i) sovereign interests (*e.g.*, creating and enforcing laws or maintaining borders); (ii) proprietary interests (interests that a private party would have from ownership or activity); and (iii) quasi-sovereign interests (*e.g.*, preventing injury to residents generally or enforcing the terms under which states participate in the

-23-

federal system).[4]  States do not have standing to sue as nominal parties on behalf of real parties in interest, and they do not have standing to sue the United States as *parens patriae* for the quasi-sovereign interest of redressing an injury to an identifiable group of individual residents. *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 600-08, 610 n.16 (1982); *Massachusetts v. Mellon (Mellon)*, 262 U.S. 447, 481-86 (1923); *Washington*, 108 F.4th at 1174-78; *Nevada v. Burford*, 918 F.2d 854, 856-58 (9th Cir. 1990) (also, asserted right to have United States comply with the law, standing alone, insufficient to confer jurisdiction).

---

[4] Arizona repeats a Supreme Court statement that a state was entitled to "special solicitude" regarding standing and suggests that solicitude be extended to all its assertions.  (Br. 17, 22, 26, 41, 44.)  In context, the Court's statement was limited: given Massachusetts' Congressionally granted procedural right to challenge the EPA's rejection of its rulemaking petition and Massachusetts' "stake in protecting its quasi-sovereign interests" it was "entitled to special solicitude" regarding standing.  *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007).  Moreover, that case involved environmental injury, implicating a quintessential quasi-sovereign right.  *See id.* at 520 n.17 (citing cases from 1901 and 1907); *see also Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 802 n.10 (2015) (noting an "astutely observed" scholarly statement that state standing to sue the United States seems to depend on the kind of claim advanced, making the cases hard to reconcile).

-24-

Arizona alleged in its complaint that "hundreds of thousands of Arizona taxpayers" are being "unlawfully subjected to federal income taxation on a payment that is not 'income.'" (ER-284.)  But the Arizona residents who paid federal income tax on, or who may be facing IRS enforcement activities regarding, the Arizona payments are an identifiable group.  *E.g.*, *Washington*, 108 F.4th at 1177-78 (pregnant women and unborn babies are identifiable group).  And each taxpayer is the real party in interest in his own dispute with the IRS.  Arizona has no duty or power to enforce a taxpayer's federal right to challenge his federal tax liability.  *Mellon*, 262 U.S. at 485-86 (United States is *parens patriae* regarding federal rights; citizens must look to United States to protect those rights); *Washington*, 108 F.4th at 1177-78; *see Adams v. Johnson*, 355 F.3d 1179, 1186 (9th Cir. 2004) ("Congress has given taxpayers all sorts of rights against an overzealous officialdom" (quotation marks omitted).)

Arizona must therefore show an injury to its own interests and that declaratory or injunctive relief would remedy its injury.  Because it did not (and cannot), the District Court's judgment should be affirmed.

-25-

### B. Arizona's alleged loss of sales tax revenue does not give it standing via financial injury

#### 1. States cannot claim standing based on incidental or indirect effects of federal policy on state revenues and spending

The incidental or indirect effects of federal policy on state revenues and spending do not confer standing because it would be impossible to accommodate the differing laws and circumstances that inevitably cause any federal policy to affect them differently. *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023); *Florida v. Mellon*, 273 U.S. 12, 17-18 (1927); *Washington*, 108 F.4th at 1175; *Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976). For a state to have standing, there must be "a direct injury in the form of a loss of specific tax revenues," or at least "a concrete impact on state revenues" linked to the allegedly unlawful action by "a strong causal chain." *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992); *Washington*, 108 F.4th at 1175; *XY Planning Network, LLC v. SEC*, 963 F.3d 244, 252 (2d Cir. 2020); *Kleppe*, 533 F.2d at 672.

Thus, the Supreme Court held in *Florida*, 273 U.S. at 15-18, that Florida lacked standing to challenge the federal estate tax based on an allegation that it would cause Florida residents to move their property

-26-

out of state, with the speculative, remote, and indirect effect of reducing Florida's property tax revenues. Courts have also doubted or rejected standing when: (i) states challenged immigration-enforcement guidance based on allegations that it would increase their medical, educational, and law-enforcement costs (*Arizona v. Biden*, 40 F.4th 375, 381, 383-87 (6th Cir. 2022)); (ii) states challenged investment regulations arguing that a lower standard for broker-dealers would reduce the capital gains they could tax (*XY Planning Network*, 963 F.3d at 250-53); and (iii) Pennsylvania alleged that inadequate disaster relief reduced its tax revenues (*Kleppe*, 533 F.2d at 671-73).

In contrast, the Supreme Court found that Wyoming had standing where there was an actual decline in Wyoming's severance tax after an Oklahoma law required coal-generated electricity to use 10% Oklahoma coal. *Wyoming*, 502 U.S. at 442-48. And this Court has held that expert testimony regarding the cancellation of specific construction projects diverting federal dollars allowed states to show direct injures from lost taxes. *Sierra Club v. Trump*, 977 F.3d 853, 863, 870-72 (9th Cir. 2020), *vacated due to changed circumstances sub nom. Biden v.*

-27-

*Sierra Club*, 142 S. Ct. 56 (2021).  *But see El Paso Cnty. v. Trump*, 982 F.3d 332, 338-41 (5th Cir. 2020) (disagreeing with *Sierra Club*).

### 2. The allegations in Arizona's complaint are insufficient to establish standing

At the pleading stage, a complaint must establish standing with sufficient factual support to survive a Rule 12(b)(6) motion.  *Lujan*, 504 U.S. at 561; *Jones*, 74 F.4th at 1056-57; *Leite*, 749 F.3d at 1121-22. Courts need not accept as true, however, conclusory or naked assertions unsupported by well-pleaded predicate facts.  *Ashcroft*, 556 U.S. at 678-81; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-57 (2007).

Here, Arizona asserted that the IRS's position that the Arizona payments were taxable "harmed Arizona taxpayers" by compelling them "to remit an estimated $20.8 million to the IRS."[5]  (ER-285.)  Otherwise, Arizona taxpayers would have retained that amount "to be spent or otherwise enjoyed as they saw fit."  (ER-275; ER-285.)  And according to Arizona, they "would have spent a significant portion" of that amount in Arizona on goods and services subject to Arizona's sales tax and would

---

[5] The $20.8 million figure is unsupported, and any improper extra tax would injure individual taxpayers, not Arizona.  *See Mellon*, 262 U.S. at 482 (burden of federal taxation falls not upon the states but upon individuals).

-28-

have also used the money to pay property, licensing, and other taxes in Arizona. (ER-285.)

Arizona's Department of Revenue calculated that Arizona lost "approximately $480,000" in sales taxes that would have come from Arizona taxpayers spending the alleged $20.8 million in Arizona "in a manner that promoted Arizona's economy and their own wellbeing." (ER-285.) But Arizona did not plead predicate facts to support the alleged loss of $480,000 in sales tax revenue or explain how it was calculated. That loss, therefore, was not well pleaded (Br. 19-20, 34) and need not be accepted as true. Without it, there is no financial injury.[6]

In any event, even if Arizona's allegation were accepted as true, the District Court correctly concluded that it did not state an injury in fact because it was "derivative and speculative." (ER-9.) As the court explained, "the loss of state tax revenue generally does not constitute an

---

[6] Arizona also argues that it was injured by having to issue Forms 1099, but that occurred before Arizona filed its complaint. (ER-282; Br. 24-25.) Because that purported injury cannot be redressed by the requested declaratory and injunctive relief, Arizona cannot continue to assert standing based thereon. *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013) (standing must persist throughout litigation).

-29-

injury in fact for the purposes of standing." (ER-8.)  Instead, Arizona

had to, but did not, allege a direct injury from the loss of specific tax

revenues.  (ER-9.)  The asserted loss of $480,000 in sales tax revenue

derived from alleged harm to Arizona taxpayers who had paid federal

tax, and it depended on assumptions regarding how they otherwise

would have spent that money.  (ER-9.)  Indeed, allowing standing on

Arizona's "broad theory of injury" would allow state challenges to *every*

federal tax assessment on the "speculative notion" that taxpayers would

have spent the assessment amount on purchases subject to sales tax.

(ER-9.)

     As the District Court stated, the complaint failed to demonstrate

"a direct link between the IRS's decision and [Arizona's] loss of state tax

revenue, relying instead on a causal chain that is too attenuated to

support standing in this case."  (ER-9.)  Moreover, each link in that

causal chain depended on decisions by independent third parties.  The

claimed loss of sales tax depended on the extent to which: (i) Arizona

taxpayers agreed with the IRS's advice and reported the payments;

(ii) their income was high enough that payments were subject to federal

tax; (iii) the nominal extra income or tax was not absorbed by losses or

-30-

credits with no net tax increase; (iv) the IRS is prioritizing enforcement in this area; and (v) Arizona taxpayers would have spent the tax savings on items subject to the Arizona sales tax. Regarding the last item, Arizona taxpayers might also have decided to spend the tax savings in ways not subject to the Arizona sales tax, like vacations out of state, paying down debt, acquiring nontaxable items, or increasing their savings.

The District Court's ruling is consistent with this Court's recent opinion that Idaho lacked standing to intervene based on allegations in its complaint that the FDA's relaxing of regulations for a drug would increase its Medicaid costs. *Washington*, 108 F.4th at 1174-76. "Even taking Idaho's highly speculative allegations as true, the complaint does not demonstrate an injury-in-fact because it depends on an attenuated chain of healthcare decisions by independent actors that will have only indirect effects on state revenue." *Id.* at 1174. Although plausible, Idaho's proposed chain relied on "speculation about the unfettered choices made by independent actors not before the courts" that would indirectly affect state spending or revenue. *Id.* at 1175.

-31-

### 3. The two later declarations do not overcome the deficiencies in Arizona's complaint

Arizona later introduced two declarations by Karen Jacobs from the Arizona Department of Revenue. (ER-192-200.) Even if those documents could be considered in a facial challenge to jurisdiction, they do not overcome the defects in the complaint. (*See* Br. 19, 33-34.)

The first declaration, attached to Arizona's injunction motion, states only that the Department analyzed aggregate taxpayer data and repeats the allegations in the complaint. (ER-193-94.)

The second declaration, attached to Arizona's opposition to the United States' dismissal motion, has a three-paragraph explanation of Ms. Jacobs's calculations. (ER-197-99.) She: (i) divided Arizona taxpayers into brackets by federal adjusted gross income; (ii) stated an aggregate Arizona payment amount for each bracket; (iii) multiplied each bracket's amount by that bracket's "estimated federal average effective tax rate, or the percent of income that an individual would pay in federal taxes" from the IRS's Statistics of Income; and (iv) added the products for the $20.8 million. (ER-197-98.) Ms. Jacobs then consulted the Washington, D.C. Burden Study, which she represents calculates an estimated sales tax burdens for households at five incomes. (ER-198.)

-32-

Stating that Arizona data for 2021 indicated that the average household claiming an Arizona payment had an income of $87,000, she chose the 2.3% sales tax burden for a household with income of $75,000. (ER-198.)  Finally, $20.8 million times 2.3% yielded the $480,000 estimate of lost sales tax revenue.  (ER-199.)

That declaration does not overcome the complaint's defects.  It neither attaches nor provides citations for any of the supporting material on which it relies.  And it confirms that Arizona is asserting an indirect injury based on speculation about the downstream effects of independent, third-party decisions.  *See Washington*, 108 F.4th at 1174-75.  Like the complaint, it assumes (albeit with more detail) that: (i) Arizona taxpayers will report the payments; (ii) they will pay federal tax on them or face IRS enforcement; and (iii) the federal tax otherwise would have been spent on items subject to the Arizona sales tax.  But as the complaint admits, Arizonans are free to spend or otherwise enjoy their money as they see fit.  (ER-275; ER-285.)

### 4. Arizona's arguments are based on a standard that is contrary to law

Arizona proposes that standing exists at the pleading stage whenever a state alleges a plausible causal chain that it will suffer even

-33-

a trifling loss of revenue. (Br. 34, 37, 39.) The states in the cases that Arizona tries to distinguish would easily clear that low bar. (Br. 37-39.) But that is not the standard, nor could it be because virtually all federal policies—especially tax policies—will adversely affect the spending or revenue of states. *See Washington*, 108 F.4th at 1176. This Court has heeded the Supreme Court's caution to be wary of theories of state standing under which cognizable injuries include the indirect effects or peripheral costs of federal policy. *Id.* at 1175. Such a "boundless conception of Article III's injury requirement" would "make a mockery of Article III. *Id.* at 1175-76. Instead, a state must allege a concrete impact on state revenues that is direct or indirect but connected by a strong causal chain. *Id.* at 1174-75. That Arizona failed to do.

Arizona cites *Wyoming*, 502 U.S. at 442-48, but there, unrebutted evidence showed a direct injury to Wyoming in the form of the actual loss of severance tax revenue after Oklahoma enacted its coal-usage law. (Br. 19, 34-35.) Arizona also cites *New York v. Yellen*, 15 F.4th 569, 575-77 (2d Cir. 2021), in which the Second Circuit held that four states had standing to challenge the legislative cap on the deduction for state and local taxes based on an alleged chain of causation that would

-34-

lead to declines in property and transfer taxes.  (Br. 19-20, 36-37.)  We submit that *New York* was incorrectly decided and that the causation chain therein would not pass muster under this Court's more recent *Washington* precedent.  Moreover, in contrast to Arizona's three-paragraph, post-complaint explanation (ER-197-99), the *New York* states supported their complaint with multiple declarations by tax and budgetary experts that (according to the citations in the opinion) spanned at least pages 69-150 of the joint appendix.  *Id.* at 575, 577.

## C.  Arizona's alleged differential treatment does not give it standing via sovereign injury

### 1.  Arizona's situation is not comparable to that of the states that made payments in 2022

Arizona alleged that it incurred a sovereign injury because the IRS considered its 2023 payments to be taxable after purportedly deciding that "similar payments and rebates issued by other states [in 2022] were not subject to federal taxation."  (ER-290.)  The District Court correctly held that this did not demonstrate injury by differential treatment.  (ER-10-11.)  The IRS made no determination about the taxability of the 21 states' 2022 payments, but rather decided, for prudential reasons and for 2022 only, that it would not challenge

-35-

taxpayers' exclusion of those payments from the income they reported on their 2022 returns. And in any event, the circumstances surrounding Arizona's 2023 payments were materially different than those surrounding the other states' 2022 payments.

### a. The circumstances of IR-2023-23

In March 2020, the President declared the COVID-19 pandemic to be a national emergency of sufficient severity to warrant an emergency declaration under the Stafford Act. (ER-166.) The emergency lasted over three years, with the HHS Secretary announcing on February 9, 2023, that the emergency would expire on May 11, 2023. (ER-153-55.) In 2022, in the heart of that emergency, 21 states enacted programs to give special payments to their residents. (ER-100.)

On February 10, 2023, in the midst of the filing season for 2022 returns, the IRS issued news release IR-2023-23. (ER-100-02.) The purpose of IR-2023-23 was to facilitate the filing of 2022 returns, not to provide a definitive analysis of the federal taxation of state payments. The release was to clarify "the federal tax status involving special payments made by 21 states in 2022" and "to assist taxpayers who have

-36-

received these payments file their returns in a timely fashion."

(ER-100.)

> **b.    The 17 states whose payments were not challenged under the general welfare and disaster relief exclusions**

Contrary to Arizona's repeated argument (*e.g.*, Br. 1-2, 5-6, 8, 19,

25, 54-55, 58), the IRS did *not* determine that the special payments by

17 states were nontaxable under the general welfare and disaster relief

exclusions. It stated only that those payments "*may* fall in these

categories," and it explained its position with the language of

forbearance, not decision. (ER-101 (emphasis added)). The IRS stated

that "the rules surrounding their treatment for federal income tax

purposes are complex" (ER-100) and that determining whether a

payment qualifies under those exceptions is "a complex fact intensive

inquiry that depends on a number of considerations" (ER-101).

Although state payments generally are includable in income, the IRS

determined "that in the interest of sound tax administration and other

factors, taxpayers in many states will not need to report these

payments on their 2022 tax returns" (ER-100) and repeated that its

determination was "in the best interest of sound tax administration"

-37-

(ER-101). The IRS thus balanced "the complicated fact-specific nature of determining the treatment of these payments for federal tax purposes" against "the need to provide certainty and clarity for individuals who are now attempting to file their federal income tax returns." (ER-101.) It decided that "it will not challenge the taxability of payments related to general welfare and disaster relief" (ER-100), twice repeating the phrase "will not challenge" on the next page (ER-101).

That the IRS was granting a one-time forbearance is further shown by the language in IR-2023-23 limiting it to 2022. Arizona errs in arguing that it was not so limited. (Br. 29-30.) The IRS stated expressly that it was not challenging exclusions "for federal income tax purposes *in 2022*." (ER-101 (emphasis added).) And it explained that decision by noting the "outgoing pandemic" and emphasizing that "the pandemic emergency declaration is ending in May, 2023 *making this an issue only for the 2022 tax year*." (ER-101 (emphasis added).) The IRS also expressed appreciation for the patience of the tax community "as the IRS and Treasury worked to resolve this unique and complex situation." (ER-100.) It is inconsistent for Arizona to cite IR-2023-23 as

-38-

a benchmark but then ignore its linguistic and temporal limitations.
(Br. 54.)

Later IRS guidance confirmed that IR-2023-23 applied to 2002
only. In August 2023, the IRS issued news release IR-2023-158
(ER-157-58) and Notice 2023-56 (ER-160-75) in response to "requests
for guidance regarding the Federal income tax consequences of State
payments made in 2023 and future years" (ER-161). The IRS noted
that many of the 2022 payment programs "were related, directly or
indirectly, to the various consequences of the [COVID-19] pandemic."
(ER-157; ER-160.) And it stated that the February guidance in
IR-2023-23 "only described the taxability of payments made during
2022," with Notice 2023-56 updating that guidance for 2023 and
subsequent tax years. (ER-157; ER-161.) Notice 2023-56 itself
reiterated that the earlier guidance "applied only for payments made in
2022" and was issued "to provide certainty for the 2023 Federal income
tax filing season" for 2022 returns. (ER-160-61.)

Later, in a letter to the Arizona Attorney General, the IRS
explained further that its February 2023 guidance (in IR-2023-23) had
"provided broad administrative relief for state payments made in 2022

-39-

because it was the middle of filing season and numerous states had

adopted a variety of payment programs requiring a fact-intensive

analysis to determine whether they qualified for an exclusion."

(ER-177.)  The IRS had "provided this administrative relief on an

expedited basis in order to provide taxpayers the certainty they needed

to be able to file their returns without undue delay."  (ER-177.)  But the

February 2023 guidance "did not reflect a legal determination as to the

proper treatment for each of the payments" and "made clear that this

administrative relief applied only for payments made in 2022."

(ER-177; *see also* ER-189.)

    In contrast to the circumstances of 2022 and its corresponding

2023 filing season, Arizona enacted its legislation on May 11, 2023—the

last day of the COVID-19 emergency—with payments to be made

months after the emergency's end (from October 15 through

November 15, 2023), which would be reported on 2023 returns to be

filed in 2024.  (ER-97; ER-146-49; ER-153.)  That calmer environment

allowed the IRS, in the ordinary course of business, to consider

Arizona's program on its merits and determine that Arizona's payments

did not qualify for any exclusion from income.

-40-

Arizona does not and cannot argue that payments under its program would not have received the same forbearance as those of the 17 states had Arizona enacted its program and made its payments in 2022. Nor is there any indication whether the payments under any of the 17 states' 2022 programs would have been treated as excludable from income had they been issued in 2023. As the United States noted in its reply supporting its dismissal motion, the only other state with a 2023 payment program, Minnesota, received the same IRS guidance as Arizona.[7] (ER-216.)

Arizona isolates words like "complex" and "fact-intensive," and it accuses the IRS of inconsistency with its treatment of state-imposed labels. (Br. 14, 18-19, 21, 26-29, 31.) The full context of IR-2023-23, however, shows no IRS decision on the merits of the various 2022 state-payment programs, but rather the reasoned balancing of the difficult

---

[7] The reply links to a letter that former Commissioner of Internal Revenue Daniel I. Werfel sent to Minnesota Representative Pete Stauber, who made the letter publicly available on his official Congressional website. (ER-216.) Because the letter's authenticity is not disputed and it has been made public, the Court can take judicial notice of the fact that the IRS sent a letter stating that the Minnesota payments were not excludable from income. Fed. R. Evid. 201(b); *Lee v. City of Los Angeles*, 250 F.3d 668, 688-90 (9th Cir. 2001).

-41-

and time-consuming inquiry necessary to evaluate 17 programs against the pressing need to facilitate the timely filing of 2022 returns. The 17 programs arose during a declared disaster that would soon end, but determining whether the payments made under those programs qualified for the disaster relief or general welfare exclusions would require extensive analysis in the middle of the filing season. The IRS therefore decided, in the interests of sound tax administration, to grant a one-time forbearance to facilitate return filing for the 2022 tax year.

Thus, the IRS did not arbitrarily or capriciously discriminate against Arizona or restrict a ruling on a matter of law to the single year 2022. (Br. 31, 53, 55-57.) To the contrary, it is hard to imagine a more reasoned basis than a pandemic in 2022 that had abated by 2023.

Context also resolves the other purported anomalies Arizona identifies. Because IR-2023-23 did not announce a legal determination as to the merits of each payment program, it was proper for the IRS to cite the pandemic as an "example" and to describe "many" of the programs as "related, directly or indirectly," to the consequences thereof. (ER-101; ER-160; Br. 6-7, 30-31, 57.) And because the IRS later issued Notice 2023-56 to provide prospective guidance for years

-42-

after 2022, there was no need for it to retrospectively evaluate the 2022 programs.  (ER-160-61; Br. 11.)  Nor is it fruitful to discuss the income qualifications in the 2022 programs enacted during the heart of a declared disaster.  (Br. 7-8, 54-55.)  The IRS's forbearance was consistent with I.R.C. § 139(b)(4), which allowed the presumption that the need prong of the general welfare exclusion was satisfied for all individuals affected by the disaster.  (*See* Br. 57.)  Notice 2023-56 (ER-167); Notice 2002-76, 2002-2 C.B. 917, 917-18.

### c.    The four states whose payments were tax refunds

The remaining states in IR-2023-23 capped their 2022 payments at the amount of state tax paid by each recipient, allowing their payments to qualify as nontaxable refunds of state tax (except for taxpayers who had claimed a federal deduction of the state tax).  (ER-100-01.)  Arizona did not cap its payments, thus allowing some of its residents to receive payments that exceeded the amount of state tax they had paid.  (ER-178-79; *see* ER-146-49.)  The IRS treats only programmatically capped payments as state-tax refunds, without regard to the circumstances of individual recipients.  (ER-162-63; ER-178-79.)

-43-

Thus, the IRS did not discriminate against Arizona. Had the four states not capped their 2022 payments, the IRS would not have treated them as tax refunds. And had Arizona capped its 2023 payments, there is every reason to believe that the IRS would have treated them as refunds. Arizona argues that the IRS misapplied *Maines v. Commissioner*, 144 T.C. 123 (2015), "to illegally tax nonincome," but that is a merits issue (*see* pp. 60-62, *infra*) not a disparate treatment issue. (Br. 19, 32-33.)

### 2.    Arizona's situation is not comparable to that of South Carolina in *Regan*

The District Court correctly rejected Arizona's assertion at oral argument that it had standing under *South Carolina v. Regan*, 465 U.S. 367 (1984). (ER-11-12; ER-21-23.) That case involved a 1982 statute that removed the federal tax exemption for interest on state-issued bearer bonds by limiting the exemption to registered bonds. *Id.* at 370-71. As a result, South Carolina (and the 24 states that supported it) would have had to pay greater interest on their bearer bonds or incur the extra expense of issuing registered bonds. *Id.* at 371, 382; *see also id.* at 401 (O'Connor, J., concurring). By accepting the case under its original jurisdiction, the Court recognized that South Carolina had

-44-

asserted an affront to its borrowing power that was "essential to the maintenance of its separate and independent existence." *Id.* at 371-72, 382 (exercise of the borrowing power "is of vital importance to all 50 states"); *see also id.* at 401 (O'Connor, J., concurring) (state had demonstrated injury of "serious magnitude").

Whereas *Regan* involved the borrowing power, Arizona also relies on *Arizona v. Yellen*, 34 F.4th 841, 845-46, 851-53 (9th Cir. 2022), in which this Court held that Arizona had standing to challenge a program that allowed the United States to recoup pandemic relief funds if states used them to cut taxes. (Br. 17-18, 22-24, 40-43.) In both cases, the federal statutes at issue directly impacted how a state could exercise a sovereign power. A state had to pay more to borrow no matter what or had to risk the recoupment of pandemic funds already in its coffers if it cut taxes.

As the District Court stated, however, this case is "wholly distinguishable" because nothing about the IRS's advice required Arizona to act, restricted its actions, or forced it to pay its residents more. (ER-12.) Arizona is not required "to do or to yield anything." *Mellon*, 262 U.S. at 482. Indeed, its argument to this Court advances a

-45-

much different proposition—that Arizona's "sovereign taxing prerogative" (Br. 3) allows its legislature, by labeling a payment a "tax rebate," to dictate to the United States how it exercises its superior sovereign taxing power (Br. 42-43). *See Florida*, 273 U.S. at 18 (states' taxing power is subordinate). The burden of federal taxation falls not upon the states but upon individuals, "who are within the taxing power of Congress as well as that of the states where they reside." *Mellon*, 262 U.S. at 482. And the federal tax at issue is not some special tax for Arizona but the "run-of-the-mill" income tax on payments that are presumptively "private income" in the hands of the recipients. (Br. 44.) Arizona has not been injured by its inability to control the United States's taxing power.

Prospectively (*see* Br. 3, 18, 23, 42), Arizona has no federal obligation to issue payments to its residents. If it chooses to do so and wants the payments to be excludable, it can follow the detailed guidance applicable to all states in Notice 2023-56 or seek an IRS ruling during the program's design, like many private parties do. States lack standing when a federal program does not compel state action or when their injuries are self-inflicted, "resulting from decisions by their

-46-

respective state legislatures." *Pennsylvania v. New Jersey*, 426 U.S.
660, 664 (1976) (states could avoid injury by repealing commuter tax
credits); *Mellon*, 262 U.S. at 479-80, 482 (state could decline to
participate in federal program).

Because Arizona has not suffered a cognizable injury, the District
Court correctly dismissed for lack of standing.  That holding ended this
case and should be affirmed.

## II

### Dismissal of Arizona's complaint was also warranted on the United States' theories that the District Court did not reach

#### Standard of review

Issues decided for the first time on appeal necessarily receive
plenary consideration.  In any event, dismissals for lack of jurisdiction
or for failure to state a claim are reviewed *de novo*.  *In re Silver Lake
Grp., LLC Sec. Litig.*, 108 F.4th 1178, 1188 (9th Cir. 2024); *Jones v. L.A.
Cent. Plaza LLC*, 74 F.4th 1053, 1057 (9th Cir. 2023).

———————————

Arizona points to comments by the District Court during the
proceedings below to suggest that it rejected the United States' other
theories (Br. 1-2, 15-16, 21, 40, 52-53), and it contends that the United

-47-

States cannot prevail on them (Br. 20-21, 40-58). The court, however, limited its opinion to lack of standing due to lack of injury. But if this Court were to conclude that Arizona does have standing, then it can and should affirm the dismissal of Arizona's complaint on any of the alternative grounds raised and argued by the United States below. *See Planned Parenthood v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1100, 1110-12 (9th Cir. 2020) (deciding issues for the first time on appeal).

### A. The District Court lacked subject-matter jurisdiction because the United States has not waived its sovereign immunity from Arizona's claims

As the Supreme Court recently explained, "Waivers of sovereign immunity are jurisdictional provisions that empower courts to hear claims against the Government …." *United States v. Miller*, 145 S. Ct. 839, 849 (2025). Because sovereign immunity "is jurisdictional in nature," it "deprives courts of the power to hear suits against the United States absent Congress's express consent." *Id.* Congress "must use unmistakable language to abrogate sovereign immunity." *Id.* at 852. Such waivers are read narrowly, and any ambiguities in the scope of a waiver are construed in favor of the sovereign. *Id.* at 852-53.

-48-

### 1. Most of the provisions that Arizona invoked do not waive sovereign immunity

Arizona alleged jurisdiction under 28 U.S.C. § 1331 (federal questions) and § 1340 (tax matters), but neither of those general jurisdictional statutes is a waiver of sovereign immunity. (ER-275.) *Dunn & Black, P.S. v. United States*, 492 F.3d 1084, 1088 n.3 (9th Cir. 2007); *Hughes v. United States*, 953 F.2d 531, 539 n.5 (9th Cir. 1992). Arizona also invoked Article I of the Constitution, the Sixteenth Amendment, and I.R.C. § 61 to challenge the IRS's position that the Arizona payments were income. (ER-287-90.) Those provisions grant the taxing power and define gross income. They do not provide a cause of action against the United States, let alone waive sovereign immunity. *Cf.* I.R.C. §§ 7421–7437 ("Proceedings by Taxpayers and Third Parties"); *see McMaster v. Coca-Cola Bottling Co. of Cal.*, 392 F. Supp. 2d 1107, 1112 (N.D. Cal. 2005).

In contrast, Arizona *taxpayers* have multiple avenues to challenge an IRS determination that a payment from the state must be included in the taxpayer's income. A taxpayer who omitted the payment from his return and receives a "notice of deficiency" from the IRS that includes the payment in the taxpayer's income can challenge the IRS's

-49-

determination in the Tax Court.  I.R.C. §§ 6212, 6213.  Likewise, a

taxpayer who included the payment in the income reported on his

return and paid any resulting tax can file a refund claim with the IRS

and, if the IRS denies the claim, file a refund suit in a district court or

the Court of Federal Claims.  I.R.C. §§ 6511, 6532, 7422; 28 U.S.C.

§§ 1346(a)(1), 1491; *Flora v. United States*, 362 U.S. 145, 177 (1960)

(full payment rule).  In both scenarios, the IRS's arguments will be

tested in litigation and ruled upon by a trial court, with the right to

appeal, likely to this Court.

> ### 2. Arizona's claims fall outside the waiver of sovereign immunity provided by the Administrative Procedure Act

The Administrative Procedure Act (APA), through 5 U.S.C. § 702,

waives sovereign immunity to allow suits for nonmonetary relief by

persons adversely affected by agency actions.  But limitations on that

waiver prevent Arizona from bringing this suit under § 702.

A party cannot obtain relief under the APA if another statute

precludes judicial review.  5 U.S.C. §§ 701(a)(1), 702.  As we will discuss

in part 3, *infra*, both the Anti-Injunction Act (AIA) and the tax

exception to the Declaratory Judgment Act (DJA) bar this suit.

-50-

Temporarily setting that bar aside, the APA waives sovereign immunity for challenges to agency actions made reviewable by statute and to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Arizona contends that the APA provides an "unqualified" waiver for all non-monetary claims. (Br. 47-48.) But because no statute allows Arizona to seek review of the IRS's advice, it is proceeding directly under the APA and must identify a final agency action for which there is no other adequate remedy. *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1168-72 (9th Cir. 2017); *Gallo Cattle Co. v. U.S. Dep't of Agric.*, 159 F.3d 1194, 1198 (9th Cir. 1998).

For an agency action to be final, it must: (i) mark the consummation of the agency's decision-making process and (ii) be one by which rights or obligations have been determined, or from which legal consequences will flow. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997); *Gallo*, 159 F.3d at 1198-99. Even an "ultimate administrative position" is not final for purposes of the APA unless it changes the rights and obligations of, or imposes legal consequences on, the complaining party. *Fairbanks N. Star Borough v. U.S. Army Corps of Engineers*, 543 F.3d 586, 591, 593 (9th Cir. 2008). Letters to interested

-51-

parties communicating agency views regarding what the governing statutes and regulations require are not necessarily final agency actions. *Ipsen Biopharmaceuticals, Inc. v. Azar*, 943 F.3d 953, 959 (D.C. Cir. 2019). (*See* Br. 49-50.) The bare statement of an agency's opinion about the law is not a final action even if it has practical effects, has economic consequences, or increases the likelihood of judicial proceedings to obtain a final decision about what the law truly requires. *Fairbanks*, 543 F.3d at 593-97.

The IRS's advice that Arizona's payments are includable in recipients' federal income is not a final agency action. Arizona quotes IRS language indicating an ultimate position (Br. 49), but it does not explain how that language determines Arizona's legal rights and obligations, imposes legal consequences on Arizona, or gives Arizona an occasion for compliance or defiance. That is because the IRS's position has no legal consequence even for payment recipients. A recipient can initiate judicial proceedings in the form of a Tax Court or a refund suit, thereby obtaining a final decision about the taxability of his payment. The IRS issues copious amounts of subregulatory guidance and instructions, often with examples applying the law to extant or

-52-

archetypal factual scenarios.  The tax system would soon become

unworkable if those advisories could be challenged outside of the

normal channels under the APA.  The District Court thus lacked

jurisdiction to entertain Arizona's case under the APA.

### 3.  The AIA and DJA bar Arizona's complaint.

Even if Arizona had standing and could otherwise proceed under

the APA, the District Court still lacked jurisdiction because Arizona's

complaint is barred by the AIA and the DJA.  The AIA provides that "no

suit for the purpose of restraining the assessment or collection of any

tax shall be maintained in any court by any person, whether or not such

person is the person against whom such tax was assessed."  I.R.C.

§ 7421(a).  The DJA allows suits for declaratory judgments, "except with

respect to Federal taxes."  28 U.S.C. § 2201(a).  The federal tax

exception to the DJA is at least as broad as the AIA.[8]  *Bob Jones Univ.*

*v. Simon*, 416 U.S. 725, 732 n.7 (1974).  By withdrawing jurisdiction

from suits seeking tax declarations and injunctions, the AIA and the

---

[8] The AIA and the DJA's tax exception are similar in operation, and if the AIA bars a plaintiff's demand for injunctive relief, declaratory relief under the DJA also is unavailable.  *See Gilbert v. United States*, 998 F.3d 410, 413-14 (9th Cir. 2021); *Perlowin v. Sassi*, 711 F. 2d 910, 911 (9th Cir. 1983).

-53-

DJA show Congress' antipathy towards premature judicial interference in federal taxation and its determination that tax litigation be routed into the statutorily authorized channels. *Id.* at 732 n.7, 746-48; *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 5, 7 (1962).

Arizona seeks a declaration that its payments are not subject to federal taxation and an injunction preventing the IRS from enforcing its position that they are. (ER-291.) Its suit thus falls squarely within the AIA and DJA's prohibitions and must be dismissed for lack of jurisdiction unless an exception applies. *Confederated Tribes & Bands of Yakama Indian Nation v. Alcohol & Tobacco Tax & Trade Bureau*, 843 F.3d 810, 812 (9th Cir. 2016); *Elias v. Connett*, 908 F.2d 521, 523 (9th Cir. 1990). To promote the purpose of the Acts, exceptions thereto are strictly and narrowly construed. *Yakima Nation*, 843 F.3d at 815. Arizona invokes two judicial exceptions, but neither applies here.[9]

First, Arizona falls outside the narrow exception to the AIA created in *South Carolina v. Regan*, 465 U.S. 367 (1984), as applied by

---

[9] Both Acts have statutory exceptions inapplicable here.

-54-

this Court over 30 years later in *Yakima Nation*, 843 F.3d at 814-16.[10]

Arizona tries to distinguish *Yakima Nation* from *Regan* (Br. 20-21, 43-

46), but *Yakima Nation* not only is this Court's interpretation of *Regan*

but also "is difficult to fairly distinguish from the facts here," as the

District Court correctly concluded in denying Arizona's request for a

preliminary injunction (ER-229).

To review, South Carolina challenged a statute that made the

interest on bearer bonds taxable, asserting a sovereign interest in

issuing bearer or registered bonds as it chose. *Regan*, 465 U.S. at 370-

72. It thus alleged a direct injury to a sovereign interest that "existed

separately from the bondholders' interest in avoiding taxation."

*Yakima Nation*, 843 F.3d at 815. Bondholders could purchase tax-free

registered bonds, giving them "little incentive" to purchase bearer

bonds, "pay the tax, file a refund suit, and raise the state's

constitutional claims." *Id.* at 814-15. The Supreme Court allowed the

---

[10] Arizona erroneously attributes to the *Yakima Nation* tax case a quote that appeared in *Confederated Tribes & Bands of Yakama Nation v. Yakima Cnty.*, 963 F.3d 982, 984, 989 (9th Cir. 2020), addressing Washington state's jurisdiction over crimes committed on tribal land. (Br. 46 n.4.) Standing is not discussed in the tax case.

-55-

suit because dismissing it under the AIA would have risked precluding judicial review of the statute. *Regan*, 465 U.S. at 373.

Contrary to Arizona's argument (Br. 44), Indian tribes and states are both sovereign entities and persons subject to the AIA. *Yakima Nation*, 843 F.3d at 812-14. Like the Yakima Nation, Arizona alleged derivative injuries that would be secondary consequences of possible increases in some residents' federal tax. (Br. 41-42, 44-45.) Again, the burden of federal taxation falls not upon states but upon individuals, "who are within the taxing power of Congress as well as that of the states where they reside." *Mellon*, 262 U.S. at 482. Those who paid federal tax on the Arizona payments felt a direct economic impact. So unlike in *Regan*, the taxpayers here are directly affected, whereas any injury to Arizona would be indirect. As in *Yakima Nation*, 843 F.3d at 815, Arizona's asserted injury "flows from the taxation of its [residents], and thus is wholly derivative of any injury suffered by [them]."

*Yakima Nation* also disposes of the argument that *Regan* required Arizona to be able to litigate its claims on its own behalf. (Br. 40, 42-45.) This Court acknowledged that "some broad language" in *Regan* "might suggest" that the AIA applied only to parties able to litigate for

-56-

themselves. *Yakima Nation*, 843 F.3d at 815 n.2. But "the true focus appears to be on whether the claims can be judicially reviewed at all." *Id.* As this Court explained, "[i]f the true inquiry is whether the aggrieved party *itself* can obtain review, it would have been unnecessary for the [*Regan*] Court to discuss third-party bondholder refund suits at all." *Id.*

Here, Arizona's injuries are not unique (Br. 43 n.3); as in *Yakima Nation* they are "inextricably intertwined" with those of its residents. 843 F.3d at 815-16. Arizona claims an interest in having its payments declared nontaxable under one or more of the exclusions at issue, but its residents have the same interest for the purpose of avoiding taxation. Unlike South Carolina in *Regan*, Arizona need not struggle to "convince a taxpayer to raise its claims." 465 U.S. at 380-81.

Arizona urges this Court not to "create a direct split" (Br. 46) with the Second Circuit's opinion in *New York v. Yellen*, 15 F.4th 569, 577-79 (2d Cir. 2021), but in that case, the Second Circuit purported to distinguish *Yakima Nation*. Thus, following *Yakima Nation* here will not create a circuit conflict: if the Second Circuit was right to distinguish it, then there is no conflict, and if the Second Circuit was

-57-

wrong to distinguish it, then the conflict already exists. And in this appeal, *Yakima Nation* is the precedential opinion. Moreover, the Second Circuit considered statements that the federal law at issue there (*i.e.*, the cap on the deduction for state and local taxes) was intended to coerce certain states to lower taxes or cut spending. *New York*, 15 F.3d at 574-75. Here, in contrast, the IRS applied state-neutral tests to Arizona's payments outside the exigency of a national emergency intersecting with a filing season. The cases are not comparable.

The other judicial exception to the AIA and DJA on which Arizona relies is equally inapplicable. Under *Williams Packing* an injunction can be obtained if: (i) equity jurisdiction exists (*i.e.*, irreparable harm combined with no adequate legal remedy) and (ii) "under no circumstances" can the United States ultimately prevail on the merits. *Williams Packing*, 370 U.S. at 6-8; *Elias*, 908 F.2d at 525. Again, Arizona's alleged injuries are derivative, and the affected taxpayers have legal remedies. Moreover, "under no circumstances" means that "under the most liberal view of the law and the facts, the United States cannot establish its claim." *Williams Packing*, 370 U.S. at 7. This requires the United States to show only that it has a good faith basis for

-58-

its position, not that it would necessarily prevail. *Elias*, 908 F.2d at

525. Arizona's boast that it is guaranteed to win on the refund issue

(Br. 46) is unwarranted. *See* part B, 2, *infra*.

### B. The dismissal of this action can also properly be affirmed based on Arizona's failure to state a claim on which relief can be granted

To survive a motion to dismiss for failure to state a claim, a

plaintiff must have alleged sufficient facts that, taken as true, support

relief under a cognizable legal theory. *Interpipe Contracting, Inc. v.*

*Becerra*, 898 F.3d 879, 886-87 (9th Cir. 2018); *see also* pp. 20-21, *supra*

(discussing what can be considered when adjudicating a Rule 12(b)(6)

motion). In addition to its jurisdictional defects, Arizona's complaint

failed to state such a claim on the merits.

### 1. Arizona failed to state a claim under the APA because the IRS's administrative position is not arbitrary and capricious

Even if Arizona had standing and the IRS's administrative

position were reviewable under the APA, Arizona would not be entitled

to any relief because the IRS's position is not "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.

§ 706(2)(A); *N. Cascades Conservation Council v. U.S. Forest Serv.*, 136

-59-

F.4th 816, 824 (9th Cir. 2025).  Under that deferential standard, this Court does not substitute its judgment for the agency's.  The Court presumes the agency's action to be valid while ensuring that the agency considered the relevant data and standards and explained satisfactorily a rational connection between the facts its choices.  *Id.*; *J&G Sales Ltd. v. Truscott*, 473 F.3d 1043, 1051-52 (9th Cir. 2007).  This Court will uphold the agency where its path may reasonably be discerned or where its line-drawing is not irrational and does not create dire consequences. *J&G Sales*, 473 F.3d at 1051-52.

We have already refuted Arizona's accusations of discrimination. On the merits, the well-pleaded facts, taken as true, are sufficient to determine that the IRS's administrative position that Arizona's payments are taxable is not arbitrary, capricious, or legally erroneous.

> ### 2.     The payments Arizona made in 2023 are includable in the recipients' income
>
> #### a.     Arizona's payments are not nontaxable refunds of state taxes paid

If a state statute authorizes payments not capped by previously paid state taxes, then they are not truly tax refunds and must therefore be included in the recipient's federal income, regardless of individual

-60-

circumstances.  (ER-162-63 (Notice 2023-56); ER-178-79.)  Arizona did

not cap its payments.  (ER-178-79; *see* ER-146-49.)  Therefore, the IRS

did not treat them as refunds of state taxes paid.  (ER-178-79.)

Arizona argues that the IRS misapplied *Maines v. Commissioner*,

144 T.C. 123 (2015).  (Br. 21, 51-53.)  But in *Maines*, the Tax Court

considered not state payments but instead state tax credits.  Credits are

part of the calculation of the tax due for a year.  Whereas exclusions

and deductions reduce the amount of income subject to tax, credits

directly reduce the tax liability shown as due on the return.  *See* "Tax

credits for individuals: What they mean and how they can help refunds"

at www.irs.gov [https://perma.cc/YD6S-XCAG].

Credits are classified as "non-refundable" or "refundable"

depending on whether the amount (if any) by which the credit exceeds

the taxpayer's tax liability can be refunded to the taxpayer.  *Id.*  A non-

refundable tax credit will at most reduce a tax liability to zero.  A

refundable tax credit that exceeds the taxpayer's tax liability, in

contrast, results in the taxpayer receiving a payment of the excess.  *Id.*

And in the case of a state refundable credit, the amount of that excess is

income to the taxpayer for federal tax purposes.  *Ginsburg v. United*

-61-

*States*, 922 F.3d 1320, 1325 (Fed. Cir. 2019); *Maines*, 144 T.C. at 134-36.

*Maines* involved three New York state tax credits, two of which were refundable. 144 T.C. at 126-28. The Tax Court held that the receipt of credits "that just reduce the amount of tax a taxpayer would otherwise owe is not itself a taxable event." *Id.* at 134. However, "[w]ith refundable portions of tax credits, taxpayers may receive cash payments in *excess* of their tax liability." *Id.* at 135 (original emphasis). The Tax Court therefore held further "that this excess portion that remains after first reducing state-tax liability and that may be refunded is an accession to the [taxpayers'] wealth, and must be included in their federal gross income under [I.R.C. § 61] for the year in which they receive the payment or are entitled to receive the payment unless an exclusion applies." *Id.* at 136.

This case involves direct state payments, not refundable credits. The difference is that credits are part of the calculation of tax due and have the effect of reducing the taxpayer's tax liability before any excess generates a refund. Arizona's payments, in contrast, did not reflect any excess of a taxpayer's liability (*i.e.*, a tax refund); rather, the payments

-62-

were made regardless of the recipients' state-tax liability, so long as their liability was at least $1.

That Arizona characterized the payments as tax "rebates" is inconsequential. A state can apply whatever label it wants to a direct payment, but the label does not change the substantive character of the payment. Giving those labels controlling effect would improperly allow states to dictate to the United States how it could exercise its superior taxing power. *Florida*, 273 U.S. at 18 (states' taxing power is subordinate); *Maines*, 144 T.C. at 131-33. Regardless of state-law labels, the United States, through the IRS, must retain the ability to impose federal tax according to the economic reality of the payments. *Maines*, 144 at 133. The IRS does so by treating state payments as state-tax "refunds" only if state payments are capped at the amount of previously paid state taxes. It is not arbitrary or capricious for the IRS to uniformly employ that sensible test.

### b. Arizona's payments do not qualify for the general welfare exclusion

Arizona's payments do not qualify for the general welfare exclusion, and Arizona criticizes the IRS rather than defending its payments on that basis. (Br. 53-56.) The general welfare exclusion is

-63-

not based on any statute or regulation, but for nearly a century the IRS has allowed taxpayers to exclude from gross income certain payments to individuals or families by governmental units under legislatively provided social benefit programs. GCM 36470 (1975), 1975 WL 37487, at *3. To qualify for the general welfare exclusion, the IRS typically requires that the payment have been (i) made from a governmental fund, (ii) for the promotion of the general welfare (*i.e.*, generally based on individual or family need), and (iii) not compensation for services provided. *See* Rev. Rul. 2005-46, 2005-2 C.B 120; Notice 2023-56 (ER-165; ER-173-74). Payments that have qualified for the general welfare exclusion shared the traits of being directed to low-income individuals or families based on their need and for a specific, welfare-oriented purpose (*e.g.*, food, medical care, housing, transportation, funeral expenses, and disaster relief). *Maines*, 144 T.C. at 138; *Bailey v. Commissioner*, 88 T.C. 1293, 1299-1301 (1987); Notice 2023-56 (ER-164-65 (examples from prior rulings)).

Arizona's payments in 2023 were not targeted at a specific, welfare-oriented need of low-income residents. Rather, the enacting legislation characterized them as general payments for inflation relief

-64-

to be paid from a state budget surplus.  (ER-149; Br. 55.)  Moreover,

Arizona residents that had no tax liability in 2019–2021 were not

eligible to receive a payment.  (ER-146-47; ER-178; ER-181.)  Thus,

residents with income below the Arizona standard deduction did not

receive a payment.  (ER-178.)  This group included single residents with

income below $12,550 and married couples with income below $25,000.

(ER-178.)  Rather than targeting relief to low-income residents with

dependents, the legislation expressly excluded them.

At the other end of the spectrum, eligibility for the payments

began to phase out at $400,000 for married taxpayers filing jointly and

$200,000 for all other filers.  (ER-178.)  Those income limitations are

above what the IRS generally considers to be covered by the general

welfare exclusion.  (ER-178.)  The payments also cover almost all

Arizona taxpayers, extending far into the territory of the wealthy.  In

2021, 95% of married joint filers had adjusted gross income below

$400,000, and 98% of Arizona single filers had adjusted gross income

below $200,000.  (ER-178.)  Those amounts also represent multiples of

-65-

the 2021 median adjusted gross incomes of Arizona taxpayers ($94,000

married, $30,000 single).[11]  (ER-178.)

### c. Arizona's payments do not qualify as disaster relief payments

Arizona's payments also do not qualify for the I.R.C. § 139

disaster-relief exclusion.  A qualified disaster relief payment includes

any amount paid to or benefiting an individual if such amount is paid

by a federal, state, or local government, or agency or instrumentality,

"in connection with" a qualified disaster "to promote the general

welfare."  I.R.C. § 139(b)(4).  Under § 139(c)(2), a qualified disaster

includes a federally declared disaster "as defined by section

165(i)(5)(A)."  To wit, "any disaster subsequently determined by the

President of the United States to warrant assistance by the Federal

Government under the [Stafford] Act."  I.R.C. § 165(i)(5)(A).

But Arizona enacted its payment program on the day that the

federally declared COVID-19 disaster ended, and the legislation

provided for the payments to be made several months later.  (ER-97;

---

[11] To the extent that it can be considered, the second Jacobs
declaration has a table showing that Arizonans with income over
$200,000 received more than those with income up to $25,000
($21,906,000 versus $17,341,000).  (ER-198.)

-66-

ER-146-49; ER-153.)  Moreover, the legislation itself (in contrast to

Arizona's complaint) did not even mention the COVID-19 disaster or

any other potentially qualifying event.  (ER-146-49; ER-278; ER-288;

Br. 31.)  Instead, it stated that the purpose of the payments was to

"mitigate the harmful impacts of inflation by returning a portion of the

[state's] surplus to this state's taxpayers with dependents."  (ER-149.)

The IRS correctly concluded that it had no basis to treat Arizona's

payments as being made "in connection with" the COVID-19 disaster,

instead of accepting Arizona's own labeling of the payments as returns

of a portion of the state's budget surplus to selected residents.  (ER-190;

Br. 56-58.)

There was no federally declared inflation disaster, and Arizona

does not argue that there was a state-declared one.  (Br. 58.)  As the

IRS explained, inflation is a broad macroeconomic phenomenon

influenced by many factors.  (ER-191.)  Thus, payments to mitigate the

effects of inflation are not inherently payments made in connection with

the COVID-19 pandemic.  (ER-190.)

Finally, the state's requirement of at least $1 in Arizona tax

liability (ER-147) not only is irrelevant to whether an Arizona resident

-67-

suffered harm from the pandemic (or from inflation), but it also excludes Arizona's poorest residents from receiving payments. That makes as little sense for the disaster relief exclusion as it did for the general welfare exclusion.

## CONCLUSION

The judgment of the District Court dismissing this action is correct and should be affirmed.

Respectfully submitted,

/s/ *Anthony T. Sheehan*

| | |
|---|---|
| CLINT A. CARPENTER | (202) 514-4346 |
| ANTHONY T. SHEEHAN | (202) 514-4339 |

  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

*Of Counsel:*
TIMOTHY COURCHAINE
  *United States Attorney*

JUNE 4, 2025

-68-

# STATEMENT OF RELATED CASES

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** ___**25-273**_____

The undersigned attorney or self-represented party states the following:

[ X ]  I am unaware of any related cases currently pending in this court.

[  ]  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[  ]  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature**  _/s/ *Anthony T. Sheehan*_____  **Date** _**June 4, 2025**_____
*(use "s/[typed name]" to sign electronically-filed documents)*

-69-

# CERTIFICATE OF COMPLIANCE

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** _____**25-273**_____

I am the attorney or self-represented party.

**This brief contains** ____13,164_____ **words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ X ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties;
    [  ] a party or parties are filing a single brief in response to multiple briefs; or
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _/s/ *Anthony T. Sheehan*_____ **Date** _June 4, 2025_____
*(use "s/[typed name]" to sign electronically-filed documents)*